THE STATE OF FLORIDA EX REL. BENTON C. RUDE, PLAINTIFF, VS. WILLIAM B. YOUNG, CIRCUIT JUDGE, DEFENDANT.

1. To authorize the disbarment of an attorney upon a charge of unlawfully and corruptly aiding, assisting and counseling a justice of the peace to dismiss a prosecution pending before such justice, against a third person for breaking and entering a dwelling house in the day time with intent to commit a felony,

the proof must be clear both as to the act charged against the attorney and his corrupt motive   Where there is conflict of testimony there must be a clear preponderance against him.

2. Where an appellate court is reviewing the proceedings of an inferior court disbarring an attorney it should not interfere with the conclusions of the latter court upon the evidence, unless it is clear that the latter court, viewing its action in the light of the rule which requires clear proof of the act and of the bad motive of the attorney, has decided erroneously and there is a plain case of wrong and injustice to the attorney.

3. The testimony in this case held insufficient to sustain a conclusion that the motive of the relator was corrupt, and relator restored to the bar.

This is a case of original jurisdiction.

### STATEMENT.

The relator having been disbarred by an order made by the respondent sitting in the Circuit Court for St. Johns county, seeks through this proceeding, a writ of mandamus, to have his name restored to the roll of attorneys.

The alternate writ purports to give the proceedings and testimony, and so does the return.   The relator has demurred to the return, and the cause comes on to be heard on these pleadings.

According to the alternative writ, the grand jury had presented an indictment at the Fall term, 1891, of the stated Circuit Court on the 5th day of November, charging in substance that Charles B. Bucknor, on the 12th day of October, 1891, he being then County

JUNE TERM, 1892. 87

The State of Florida ex rel. v. W. B. Young.—Statement of Case.

Judge of that county, and by virtue thereof exercising the power of a committing magistrate, did, upon an affidavit received and filed by him, and made by one Mary Murray, charging one General Washington with a felony, *viz:* Breaking and entering her dwelling house with intent to commit a felony, issue his warrant; and that by virtue of said warrant, the said Washington was arrested and brought before the said County Judge, and he, the said Bucknor, as such County Judge, and under color of his office, did unlawfully and corruptly compound said felony, and did then and there corruptly receive money consideration, and corruptly refuse to send the papers filed and issued in such prosecution to the proper and legal custody, and did corruptly discharge Washington from the custody of the law. And that Benton C. Rude, an attorney and counsellor at law, was present and corruptly advising, aiding, assisting and abetting the said Charles B. Bucknor, as said County Judge, the said crime to do and commit, contrary to the form of the statute.

This indictment, according to the statement of the alternative writ, was quashed, and the inference to be drawn from such writ is that it was upon such quashing that the proceedings resulted in the dismissal of the relator were instituted; but we infer from the return that the indictment, upon the quashing of which such proceedings were commenced, was one presented

November 6th, 1891, and settling up the issue of a warrant on October 12th of the same year, by the County Judge, upon an affidavit made by Mary Murray, charging Washington with feloniously breaking and entering in the day time the dwelling house of said Mary, with intent to commit a felony; such indictment charging also the arrest of Washington on such warrant, and bringing him before such County Judge to be dealt with according to law, and that such County Judge, on the 19th day of October, by color of his office, did unlawfully and corruptly dismiss the prosecution and discharge Washington from the custody of the law; and further charging that Rude, on the day last named, was corruptly present, and did then and there unlawfully and corruptly aid, assist and counsel the said Bucknor the said crime to do and commit contrary to the statute.

Upon the quashing of this indictment, it seems that the Judge ordered the relator to show cause why he should not be dismissed from the bar for the acts charged in the indictment; or, as the charge is stated in the order of dismissal, for that he "did corruptly and unlawfully aid, assist and counsel C. B. Bucknor, County Judge, to discharge a prisoner then before him on a charge of felony." Rude announcing that he was ready to proceed in the matter, the court proceeded to hear the evidence. No order to show cause appears in the record before us; all we know of it is

gathered from the disbarring order of November 11th, 1891, and the order of December 21st, of the same year refusing a rehearing.

The testimony, adduced on the hearing, stating it as it is given by the Judge in his return, is as follows :

Mary Murray testified:   I went to Judge Bucknor's office on a case against Washington.   Judge Bucknor told me I had better go and talk with Mr. Rude about the case.   I went to Rude's office, and he tried to get me to drop the case; told me I would not make anything if I went on with the case.   I would not agree to this, and went back to the County Judge's office.   After awhile the deputy sheriff brought Washington in and then Rude came in and called me out in the hall and told me that Washington would give me six dollars to compromise the case, and that I had better take it; that I would not get anything if I did not.   I agreed to take it, and he handed me six dollars and told me to take it and go along home.   I took the money and went.

Emma Hearn testified that she went to the office of the County Judge with Mary Murray on October 9th, 1891.   He told Mary she had better go to Rude's office and talk with him about the case, that Rude wanted to see her; that Mary went to Rude's office. After she came back Rude called her out into the hall and she went, and did not come back.

Turner testified:   I am deputy sheriff of St. Johns

county. I arrested Washington on a warrant issued by Judge Bucknor. As I was taking him from the jail to Bucknor's office he said he wanted to go to Rude's office; that his brother-in-law had employed Mr. Rude to defend him. I took him to Rude's office and he had some conversation with Rude, and Rude asked him to let him see the warrant, and I showed it to him. There were several persons in Rude's office at that time. The prisoner was hand-cuffed. I then took the prisoner to the office of the County Judge. When I got there Judge Bucknor said: "Where is Rude?" and got up and went in the direction of Rude's office. In a short time he and Rude came back together. Rude then called Mary Murray back into the hall and had some conversation with her. He came back into the County Judge's office and got some money from Washington and went out into the hall again. In a short time he came back alone, and asked me how much the sheriff's costs were, and I told him. He then asked Judge Bucknor how much his costs were, and Bucknor told him. He then paid the costs to Bucknor, and said: "As nobody appears against the defendant, I move that he be discharged," and then Judge Bucknor discharged Washington. On *cross-examination* he stated, he was the brother-in-law of the sheriff, and that there was a bad feeling between the sheriff and Rude, but that witness has no feeling against Rude.

Counsel for Rude "then wanted to ask the witness

if the sheriff had not been held to answer a criminal charge at that term of the court, which the court refused to allow, upon the ground that the best evidence was the papers on file in the court, the court having judicial knowledge of them, as the attention of the Judge had been called to them in open court at that term, and that, in his opinion, it was immaterial anyway."

W. F. Forward testified : On October 19th, I was sitting in the office which is across the hall from the County Judge's office. The door was open. I saw Rude come out of the County Judge's office into the hall with Mary Murray and have some conversation with her. He then went back into Judge Bucknor's office and came out with some money in his hand, some bills and some silver. I saw him hand to Mary some money, part paper and part silver, and then I heard him say to her, "now take this and go home."

Michael Lotta testified : I was in front of the courthouse, at the window of the County Judge's office, October 19th. When the deputy sheriff brought Washington to Judge Bucknor's office, I heard Judge Bucknor say, "Where is Rude ?" Then I saw Judge Bucknor get up and go off down the street in the direction of Mr. Rude's office. He stopped on the sidewalk and stood around until Mr. Rude joined him, then Rude and Bucknor came back together. Then, after they had gone into the County Judge's office, Mr. Rude called Mary Murray out into the hall. I

could see into the hall from the front of the court-house, and I·saw Mr. Rude in conversation with Mary Murray. Mr. Rude then went into the County Judge's office and came out immediately with some money in his hands and paid some money to Mary Murray. She took the money and left, and Mr. Rude went back into the County Judge's office.

Rude in his own behalf, then testified: Was in my office on·October 19th. Had heard nothing of Washington's case, and never knew him or Mary Murray. First an unknown colored man came in and said his name was Sample, and that his brother-in-law had a suit before Judge Bucknor, and wanted me to attend to it. I asked him what it was about. He said that Mary Murray claimed that Washington had some old furniture of hers, worth five or six dollars ; that the sheriff had been to Washington to get it, and the case was about to come off. I was very much annoyed, being very busy with an important matter, and told him I did not want the case ; that I never took a case for a colored man unless prepaid, and that I would not go. He went off, and soon afterwards a colored woman, who said she was Mary Murray, came in and said Judge Bucknor sent her to me to see if I could not settle her case with Washington. I asked her what she claimed, and how she knew Washington had it. She told me flat-irons, jars, etc., worth six dollars, and that two women had seen Washington at the place where they were the day she missed them, and a man had seen him with the things. I told her that the value was too

small to go to law about, she had better settle it. She went off, and a crowd came into my front office, and a colored man came into my private office, said he was General Washington, and wanted me to go to Bucknor's. I said I would not go unless he prepaid me at least five dollars. He did not have the money, and as he started to go, I asked have you any goods of Mary Murray's. He said no. Did he know what she claimed or how she claimed he got them. He said no. I said the thing is too small to law about; find out what she claims and settle it. He said Sample had been trying to settle with her. I said go and settle it up, and don't bother me; if you do, I shall charge you nothing. A little later Sample came in and paid me five dollars, and said that Washington wanted me at Bucknor's office. I was going to the clerk's office, and started. I had a talk with Mary Murray in the hall on to which Bucknor's office opens, and again told her that the matter was too small to law about; that Washington would pay her six dollars, and she had better take it and go home. She agreed to this, and I then asked Turner what the sheriff's costs were, and Bucknor, what his costs were; took the five dollars that had been paid to me, and got enough more from Washington to pay up the six dollars and the costs, and paid Mary Murray six dollars, and said, "Now, Washington has paid you for your goods, and they are his, and you can go along home." Up to this time I had no hint of any criminal charge against Washington, and supposed that I was compromising a replevin suit. The list of costs given me by Turner said

" serving warrant," but I did not look at the items. I paid Bucknor the costs in the case, and asked him to call and dismiss it. He did so, and as he called it I heard for the first time the words "State, as plaintiff ;" asked Bucknor for the warrant, and saw for the first time what it was. I had my mind fully occupied by my other business, and paid as little attention to this matter as I could, was only anxious to get it off my hands. I charged and got nothing for my services. I knew neither party, and had no interest in the case. I never talked about it with Bucknor, or any one, until Sample came to me. All was done openly in the presence of a number of persons. There was no attempt at concealment. I thought so little of the matter that I had never thought of it again till the indictment was found. Turner did not show me the warrant against Washington at any time. I never at any time saw hand-cuffs on Washington. I am so near and defective sighted that I can not tell my best friend coming to my office sometimes, and could not have seen handcuffs on Washington where he was in my office.

C. B. Bucknor testified for defendant : Am County Judge. On October 19th, General Washington was brought before me on a warrant issued by me for breaking into Mary Murray's shanty in the day time with intent to steal. Mary Murray came to my office that day, and as I had looked into the case, and talked with the parties and witnesses enough to see that there was nothing in the charge, that it could not be sustained, I advised her to settle it up and drop the mat-

ter. I told Mary Murray that she had better go along and see Mr. Rude, and have him see if she and Washington could not settle. After a while they all came to my office and waited. At last Washington sent up, or went up, and Mr. Rude came down. He had some little talk with Washington and Mary Murray, and then asked me what my costs were. I told him and he paid me my costs and the sheriff's costs, and I paid the sheriff's costs to Turner. Mr. Rude moved for the dismissal of the case, and I called it, and no one appearing, I dismissed it. I received just my legal fees, and no more. I had never spoken to Mr. Rude about the case when I sent Mary Murray to go and see him. I had no connection with Rude as to the case till it was all over. There was no collusion between us. The witness was here asked by the Judge, "What right had you to collect any costs from the defendant in a criminal proceeding who was discharged?" He replied that he had frequently done it; that he only received what he was entitled to receive for work already done; that he acted in entire good faith in all he did. Mr. Rude then asked for time to procure witnesses to prove his character and reputation at the North and in St. Augustine, for thirty years past. To this the Judge said: "That is not necessary, as I presume that you have borne a good character, and will give you the benefit of it without proof."

Stenhouse then testified that he kept store on St. George street. Washington had hand-cuffs on when Turner took him by my store on the 19th of October.

General Washington testified: When I was in Mr.

Rude's office, I sat down near the stove behind the door. Mr. Rude was at his desk. I was not nearer to him than I am to you (about ten feet). I had on handcuffs.

Rude then offered to prove that his sight was defective, and that he was very near sighted. The Judge said that it was unnecessary to prove it, as he had frequently seen Mr. Rude in court, and knew that he was very near-sighted.

On the 11th day of November the Circuit Judge made the following order:

CIRCUIT COURT ST. JOHNS COUNTY, FLORIDA.

In the matter of the rule against Benton C. Rude to show cause why he should not be disbarred.

In this matter the grand jury having returned into court an indictment against C. B. Bucknor and Benton C. Rude charging that said Rude "did corruptly and unlawfully aid, assist and counsel C. B. Bucknor, County Judge," to discharge a prisoner then before him on a charge of felony, and the said indictment having been quashed upon the motion of said B. C. Rude and his co-defendant, upon the ground that the statute under which it was found did not apply to them and the said Benton C. Rude being a member of the bar, and then and there present in court, thereupon the court ordered him to show cause why he should not be disbarred for the acts charged in the indictment. And the said Rude then and there announcing

that he was ready to proceed in the matter, the court proceeded to hear the evidence of the witnesses adduced. After hearing the evidence, the court finds that the said Benton C. Rude did in the case of the State of Florida vs. General Washington, charged with breaking and entering a house in the day time with intent to commit a felony, then pending before the County Judge of St. Johns county on a preliminary examination, pay to the prosecuting witness the sum of six dollars to induce her to return home, *and not to appear against the accused;* and did pay to the said County Judge the sum of *one dollar*, claimed by him to be his costs, *and procure the said County Judge to discharge the prisoner without any investigation of the charge.*

The said Rude testified in his own behalf, and admitted the facts above found, but stated that he did not know that the case was a criminal prosecution, but thought that he was compromising a replevin suit. It was not shown that any civil suit was pending in which his client, the said General Washington, was interested, but it was shown that the said Washington was carried by the office of said Rude on the way from the jail to the office of the County Judge, and had an interview with said Rude in his office, and was then hand-cuffed and in the custody of the deputy sheriff.

7

The deputy sheriff testifies that while at the office of the said Rude, he (Rude) asked for and was shown the warrant under which said Washington was arrested. (The said warrant was produced before the court in this investigation.) It was proven by the testimony of the witness who made the complaint against Washington, and who received the six dollars, that she went to Rude's office, having been told by the County Judge to go there; and that while there Rude tried to get her to compromise the matter. This also was not denied by Rude, but he does deny that the warrant was shown him; and says that he did not know the nature of the case that he was trying to compromise; that he is very near-sighted, and did not see the handcuffs on his client's hands. It is incredible that an attorney of Mr. Rude's astuteness should compromise a case of his client without knowing whether it was a civil or a criminal case. And it was in accordance with the usual course of things for the attorney to ask the officer to let him see the warrant on which his client was held, when that client was brought by the officer to his place of business to give the prisoner an opportunity of conferring with his chosen counsel. It appears from the evidence that the effort made at Rude's office to induce the prosecuting witness to compromise the case failed, but that it was renewed in the hall on to which the office of the County Judge opened; and that the sum of six dollars was then paid to the witness by Rude, and that he said to the witness when

he paid the money, "Now, take this and go home," and the witness did so.

After hearing all the evidence and the argument of counsel in behalf of said Benton C. Rude, the court took the matter under consideration, and after due consideration thereof, it is considered by the court that Benton C. Rude be and he is hereby disbarred and stricken from the roll of attorneys, and is prohibited from practicing as an attorney and counselor-at-law and solicitor in chancery in the courts of the Fourth Judicial Circuit of Florida.

Done this, the 11th day of November, A. D. 1891.

W. B. Young, Judge.

Afterwards, on the 25th day of the same month, Rude filed a petition for a rehearing, which petition was denied by an order of December 28th, 1891.

The other facts in the case are stated in the opinion of the court.

*Randall & Foster* for Plaintiff.

Brief of relator as to the proceeding by mandamus. State *ex rel.* Wolfe vs. Kirk, 13 Fla., 278 ; State *ex rel.* Kirk vs. Maxwell, 19 Fla., 31 ; *Ex parte* Bradley, 7 Wallace, 364.

The rule to show cause why the name of an attorney should not be struck from the rolls should state the charge specifically. Same authorities.

And the proofs must sustain the charges. *Ibid.*

The case must be free from doubt not only as to the acts charged but as to the motives. People vs. Harvey, 41 Ill., 377; Jackson vs. State, 21 Tex., 668.

Respondent insists that a judge has the legal right to disbar an attorney whenever it appears before him that "when an attorney commits an act showing him to be unworthy of public confidence, it is the duty of the court to strike his name from the rolls."

State vs. McClagherty, 33 W. Va., 250, is cited as authority for this. But the same court says the accused must have reasonable notice and opportunity to be heard. So according to the same authority an attorney can not be legally condemned except upon full proof of guilt of the offense with which he has been definitely charged. In other words if an attorney is charged with one offense and an investigation developes another supposed offense, he can not be convicted of the latter except after he shall be charged and a proper investigation and proof of the charge.

In the case at bar, here is an attorney who has practiced his profession many years, has established a reputation for probity and earned an enviable standing before the world (which he was not permitted to prove to the court), with a family to educate and support, practically banished from the world for the offense of having advised some poor negroes to settle a dispute about flat-irons and a skillet worth five or six dollars upon the judicial *assumption* (in place of proof) that "it is incredible that an attorney of Mr. Rude's astuteness should compromise a case of his client's without

knowing whether it is a civil or a criminal case." And because this attorney did not ascertain whether it was a civil or a criminal case, the assumption of the judge was that he knew it was a criminal case and was guilty of corruptly obstructing justice and compromising a felony and this without a motive.

This is what Mr. Rude is charged with, and upon the proof contained in the record this is what the judge convicted him of.

And this old man is sent forth upon the world, a very Pariah to be ostracised and scorned and made a beggar, after having led a useful and respectable life and been an honorable and busy member of the the bar in this and in another State.

We submit that the judgment was not warranted by the testimony in the case, that the accusation is utterly unsupported by competent evidence, and that if this sentence of banishment is allowed to stand no lawyer in Florida is safe in advising his poor client to settle a dispute about the ownership of a skillet or any other trifle which may, perchance, be the subject matter of a larceny.

RANEY, C. J. :

The charge which the relator was called upon to answer was that made against him in the indictment filed November 6th, 1891. That this indictment was the basis of the proceeding to disbar him, is clearly shown by the disbarring order and the order denying a rehearing. The charge in the indictment is this :

That one General Washington, on October 19th, 1891, was brought before Charles B. Bucknor, County Judge of St. Johns county, to be dealt with according to law, on a warrant issued on the 12th day of the same month by such judge, on an affidavit made by one Mary Murray, charging Washington with feloniously breaking and entering in the day time the dwelling house of said Mary, with intent to commit a felony, and that the said County Judge did then and there, by color of his office, unlawfully and corruptly dismiss the said prosecution and discharge Washington from the custody of the law; and that the relator, Benton C. Rude, was corruptly present, and did unlawfully and corruptly aid, assist and counsel to make the alleged dismissal of the prosecution and discharge of the prisoner.

Proof of the charge in cases of this character must be clear, both as to the act charged and as to the motive. In People ex rel. vs. Harvey, and People ex rel. vs. Miller, 41 Ill.; 277, where Harvey was charged with abstracting from the court room in the progress of a cause in which he was an attorney a certain instruction which the court had refused to give the jury on his application; and Miller was accused of abstracting a deposition taken in behalf of the defendant, in a case brought by Cook for Miller's use, the doctrine announced was that the case must be clear and free from doubt, not only as to the act charged, but also as to the motive, and it was said by the court: We are not satisfied in the case of Harvey that his withdrawal

JUNE TERM, 1892.    103

The State of Florida ex rel. v. W. B. Young.—Opinion of Court.

of the refused instruction was from a bad motive, as we do not see how he and his client can profit by it; nor can we see why Miller should withdraw and conceal the deposition in Cook's case for his use, since, on inspection of the deposition, a copy of which was among the papers, it had no great tendency to injure the plaintiff's claim, or defeat a recovery by him. The same doctrine is declared and enforced in Jackson vs. State, 21 Texas, 668, where the court in discussing a vague and defective special verdict rendered upon a charge of abandoning the defendant in a suit, and accepting a retainer from the plaintiff to prosecute the same cause, says, *inter alia*: "But the gravest omission is, that it does not find the act to have been done with a corrupt motive or evil intent, or repel the supposition that it may have been from inadvertence, or some excusable or justifiable cause." In the case of Houghton, 67 Cal., 511, the charge was making certain false statements for the purpose of misleading and deceiving the court or justices, and the Supreme Court said: that the statement had not influenced the court in reaching the conclusion arrived at in the matter where the misrepresentation was made, did not relieve Houghton of the charge of moral delinquency if the affidavit was wilfully false in that it was deliberately intended to produce a false impression; that the question was not whether the court was actually misled by the statement, but was, is the statement false, made for the purpose of deceiving the court.

And subsequently the court observes: Unless we are clearly satisfied of respondent's guilt, we ought not to remove or suspend him from the practice of his profession. As we are not so satisfied, we decline to strike his name from the roll. The Supreme Court of Wisconsin in the case of *In re* O., 73 Wis., 602, remarks: "This court has held, in effect, that where the charges of professional misconduct upon which the accused is disbarred are such as would, if true, subject him to criminal prosecution, the same 'should be established by clear and satisfactory evidence, and can not rest in doubtful and uncertain inferences.' *In re* Orton, 54 Wis., 386. But even where such charges are not of a criminal nature, yet we apprehend that, in order to justify disbarrment, they should be established by a preponderance of satisfactory evidence." Weeks, in his Work on Attorneys, p. 175, (2nd ed.), says there must be "a clear preponderance of evidence;" and the Supreme Court of Illinois, in People *ex rel.* vs. Barker, 56 Ill., 299, where the charge was the wilful disclosure of confidential facts confided to the defendant in his character as an attorney, and the testimony left it in doubt whether the defendant had learned the facts disclosed while he was such attorney, or in transactions with the parties as their creditor: *Held*, that to overcome the express denial which had been made of the charges, there ought to be required more than a mere preponderance of evidence; that a charge so grave in its character, and so fatal in

its consequences, ought certainly to be proved by what the law denominates a clear preponderance of evidence; and such evidence was wanting:   *   *   and that a man ought not to be denied the right to exercise the duties of his profession, and receive the emoluments thereof, except upon clear proof of wilful and corrupt professional misconduct.   See also *In re* Cobb, 84 Cal., 550; Walker vs. State, 4 W. Va., 749; Barker's Case, 49 N. H., 195; Bryant's Case, 24 N. H., (4 Foster), 149; State *ex rel.* vs. Chapman, 11 Ohio, 430; Bacon's Abridgement, Attorney (H), 506.

No court should, in the exercise of original jurisdiction, disbar an attorney upon a charge of this character, establishing, if proved, his unfitness morally to be entrusted with the responsibilities of the office, unless the testimony sustains it clearly, both as to the act and the bad motive; and where there is conflict of testimony, there must be a clear preponderance against him.   Where an appellate or superior court is reviewing the proceedings of an inferior court, as here, it should act with great care, and should not interfere with the conclusions of the inferior court upon the evidence, except where it is clear that the latter court, viewing its action in the light of the above rule, has decided erroneously, and there is a plain case of wrong and injustice to the attorney.   State *ex rel.* vs Kirke, 12 Fla., 278; State *ex rel.* vs. Maxwell, 19 Fla., 31. By these rules the action of the Circuit Judge in this case is to be tested.

No one of the witnesses testified that there had been any communication, direct or indirect, between the County Judge and Rude as to the charge against Washington, prior to Marry Murray's going to Rude; on the contrary, both Rude and the County Judge deny that there has been any such communication even up to the dismissal of the case. It is true that the latter part of Emma Hearn's statement, that the County Judge "told Mary she had better go to Rude's office and talk with him about the case, *that Rude wanted to see her*," implies that the County Judge was aware that Rude wished to see her, but it does not justify the inference that the County Judge had gotten his information from Rude, and not in some other manner; nor is it evidence against Rude, he being absent when the remark was made, that there had been any such communication, or that Rude had any desire to see Mary Murray.

It can not be denied that the conduct of the County Judge in leaving his office and going towards that of Rude, and waiting till Rude joined him and returning with him to the former office was, in view of what followed, calculated to arouse *suspicion* that there was while they were thus together some communication between them as to the case, but no further inference can be legitimately drawn from such conduct than that the County Judge on leaving his office desired to see Rude about the case, and to take action towards a settlement of the case, or some action like that which he

took on their reaching the County Judge's office. We
can not go into the domain of uncertain and doubtful in-
ferences and assume that conversation evidencing
corrupt purposes took place between them. Rude
must be tried upon evidence, and his conviction can
not stand unless it is supported by facts clearly
proved and clearly showing a corrupt purpose.

There is of course no doubt that the case against
Washington was a criminal charge, and not an action
of replevin ; still, one question is whether, looking at
the entire testimony, it can be said that the Judge was
justified in holding that it was clearly proved that
Rude knew he was dealing with a criminal, and not a
civil, case. It is true that the deputy sheriff says that
Rude asked him to let him, Rude, see the warrant,
and that he "showed" it to Rude. This statement,
in view of Rude's denial that he knew it was a crim-
inal prosecution, does not prove that Rude ever read
the warrant or was aware of its contents. The deputy
sheriff does not state that Rude knew the nature of
the warrant, or that Rude knew it was a criminal writ,
nor does the deputy explain what he meant by saying
that he "showed" the warrant to Rude. Adverse in-
tendments can not be made in support of a conviction
of such serious consequences as this is, and we are
without proof that the warrant was ever in the hands
of Rude before the dismissal of the case, or that the
deputy meant to imply by his language anything more

than that he exhibited the warrant to Rude, without parting with its possession. The first information which the record shows Rude had of the case was from Sample, who went to Rude's office and told him that his brother-in-law had a suit before the County Judge, and wanted Rude to attend to it. Rude asked him what it was about. His reply was that Mary Murray claimed that Washington had some old furniture of hers, worth five or six dollars, and that the sheriff had been to Washington to get it, and the case was about to come off. After he had gone, Mary Murray came and told him that the County Judge had sent her to him to see if he could not settle her case with Washington. Rude asked her what she claimed, and how she knew Washington had it. Her reply was: Flat-irons, jars, etc., worth six dollars, and that two women had seen Washington at the place where they were the day she missed them, and a man had seen him with the things; and Rude told her the value was too small "to law about," and she had better settle it. After she had gone, Washington came with the deputy sheriff, and applied to Rude to go to the County Judge's to represent him, and Rude having refused to go, as Washington did not have five dollars to pay him as a fee, Washington started out, and as he did so, Rude asked him if he had any goods of Mary's, and he replied, no; and then Rude enquired of him if he knew what she claimed, or how she claimed he got them, and to this Washington made a similar reply. These state-

ments of Rude as to his interviews with the parties named only indicate that Mary claimed that Washington had certain property which belonged to her, and that Washington denied having it; rather this, than that Washington admitted the possession of certain property which Mary claimed, and that he denied her title to the same. And that this seems to have been Rude's understanding, is indicated by his questions to Mary and to Washington. The natural inference is that Rude understood Mary to claim that Washington had her flat-irons, jars, etc., and that Washington denied the taking or having possession of any of Mary's property; and the remark of Rude: "Now, Washington has paid you for your goods and they are his, and you can go along home," made to Mary when he paid her the six dollars, indicates that his conclusion then was that the settlement was for goods of Mary's which she claimed Washington had, and that by such settlement they had become Washington's. If this was all, we should feel justified in holding that the Judge had decided erroneously in determining that Rude was aware that he was settling a criminal prosecution, but when we see that Rude's motion after he paid the costs was, that the defendant be "discharged," and upon the ground that no one *appeared against* him, and remember the presence of the deputy sheriff with the prisoner at Rude's office, which is not denied to have been known by Rude, we think there was affirmative evidence sustaining the conclusion that Rude finally understood himself to be engaged in the

settlement of a criminal case.    In coming to this con-
clusion, we of course adopt the view of the Circuit
Judge, that Rude, on account of his near-sightedness,
did not see that Washington was in hand-cuffs while
at his office.

But does the simple fact that the relator has com-
promised a criminal case, necessarily imply that he
has done so corruptly or with a bad motive?    Illegal
acts are not necessarily corrupt.    We must look to
and be controlled by the circumstances of each partic-
ular case, in forming our judgment as to what motive
characterized it; and in the matter before us if the
circumstances disclosed by the testimony are such as
it can be said of them that they could not have made
it clear that the motive of the relator was corrupt; or,
in other words, if the evidence is such as naturally and
reasonably must have rendered the question of his
having such a motive, one of doubt, the dismissal of
the relator from the bar should not be sustained.
The circumstances of this case must be found in the
evidence; we can not go beyond it for them.    They
are, that the County Judge having looked into the
case, talked with the parties and the witnesses enough
to see that there was nothing in the charge, and that
it could not be sustained, advised her to settle it and
drop the matter, and told her she had better go to the
relator and have him see if she and Washington
could not settle it.    Acting upon this advice, she
goes to Rude, and tells him that the County Judge

has sent her there for the purpose indicated, and she having explained her case to him, as shown in a previous part of this opinion, he tells her the value is too small to go to law about, and that she had better settle it, or, and she says, "had better drop it." This she would not agree to do, and went back to the County Judge's office. Rude's advice to Washington on his coming there and going away without securing his services, was similar to that he had given Mary Murray; it was, that "the thing was too small to law about; find out what she claims, and settle," and, further, on Washington's saying that Sample had been trying to settle with her, "go and settle it up, and don't bother me; if you do, I shall charge you nothing." Considering that no previous acquaintance upon the part of Rude with the case, or with Sample, Washington, or Mary Murray, is shown, but, on the contrary, is denied by Rude, and that no interest in the case or connection with any of the parties is made to appear, and no collusion or previous communication between Rude and the County Judge is proved, there is nothing in the action of Rude up to this point to indicate a fraudulent or corrupt purpose. Having been approached by the complainant or prosecutrix as having been sent to him by the County Judge to see if he could not settle the controversy between her and Washington, the conclusion of Rude's mind, in the absence of circumstances to establish the contrary, must naturally have been that the case, though crimi-

nal in its character, was frivolous, and ought to be settled; and this although Rude did not know of the investigation which had been made of it by the County Judge; and, so far as we are informed by the record before us, there is nothing to indicate that it was not of that character. It can not be assumed that it was not of this character; no one has said that it was not, nor has any one said that the County Judge did not make the investigation which he claims to have made, or that the conversations between Rude and Mary, and Sample and Washington respectively, were not as Rude stated them to be. Mary Murray's statement as to her interview with Rude is not inconsistent with Rude's account of it. He seems to have been impressed from the first with the idea that the case was one that should be settled, and to have acted with this view. There was no secrecy or effort at concealment in his conduct, but, on the contrary, his action, even when making the settlement, is open, and is shown to have been understood by those who were present. It does not appear that the desire for gain played any part in his action; instead of this, he not only stated to Washington that he would charge no fee if it was settled, but even used the very money which Sample had paid him as a fee for Washington. No previous, or other transaction of this kind, or of any shady character upon his part, or between him and the County Judge is hinted at; nor is there any evidence of any other conduct clouding his reputation as

an attorney; on the contrary, when he asked time to prove his character and reputation at the North, and St. Augustine, in this State, the place of the inquiry, he was told that it was unnecessary, and assured that he would be given the benefit of the presumption of having borne a good character.. Not only is the irregular action which the testimony imputes to him isolated, and open, and not shown to have been inspired by the hope of pecuniary gain, but to the contrary there is an entire absence of any circumstance which suggests a hope of benefit to himself.

That the County Judge was willing to permit the costs of the case to be paid by Washington, and to accept the payment of his own fees from Washington when he knew that the charge could not be sustained, is an unfavorable circumstance. Standing alone or unexplained, it is an evidence of corrupt conduct upon the part of the County Judge, in that it would indicate that he was dismissing a criminal charge against a defendant upon a consideration paid by the defendant. It should never be done. If an examining court knows there is no case against the defendant, the case, should never be dismissed *at the cost of the defendant*. To the extent that the court has gone at the time of the dismissal, the court should look to the State, or whoever else under the law may be liable for the costs, and innocent defendants should not suffer by the payment of costs, nor should the reputation of

courts be impugned by the suspicion which such pay-
ment naturally creates, nor should attorneys consent
that their clients shall pay costs except as a conse-
quence of their conviction or pleading guilty.
Though this is all true, yet it is equally true that the
dismissal of a single criminal charge against a defen-
dant at his cost by an examining court is not conclusive
of the corrupt motive of the court; it does not establish
*as a matter of law*, either that the court was acting
in the interest of and to shield the accused, or for the
furtherance of a special or general purpose to obstruct
or defeat the prosecution of crime, or that an attorney
who may have been party to it was likewise corrupt.
If the County Judge, in dismissing this case, was not
doing so for the purpose of shielding the accused, or
of defeating criminal justice, and was not in-
duced to do so by the payment of the costs
by the defendant, but consented to the dis-
missal because he had investigated the case, as
stated by him, and found there was nothing in it, and
believed it ought to be dismissed, then the mere fact
that he permitted the defendant to pay the costs which
had accrued, and accepted those payable to himself, is
not sufficient to establish, and can not be held to estab-
lish, fraud or corruption.    Unquestionably it was im-
proper practice, and should not be tolerated, but it
does not prove fraud or a corrupt intent in him or the
other officer whose fees were paid at the same time ;
and the same may be said of the County Judge having
frequently done the same thing *in good faith* before,

where he had found there was no merit in the charge. It can not be correctly said that this course adds anything to the officer's purse, for the State was liable for all costs had the examination been proceeded in, even if a discharge of the defendant had resulted. It is not shown that anything ever passed between the County Judge and the defendant as to his case, or at all, or that it was ever possible that there could have been any secret interview between them. His dealings on this line were with the complainant, and he advised her to settle it and to drop it ; but it is not claimed by Mary Murray, or any one that he ever offered her any inducement to do so.

It is not shown that the circumstances of Washington's getting the property claimed by Mary Murray, or of her losing possession thereof, were such as would produce the impression that the case was one which the County Judge should not have advised the settlement of ; in fact no showing as to what those circumstances were, is made. From the time Rude was told by Mary Murray that the County Judge had sent her to him to see if she could settle her case with Washington, Rude seems to have acted in reference to this suggestion ; and that he did so openly without any effort at concealment, is unquestionable ; and so it is that the record fails to show that he made any mistake, in so far as the real circumstances of Washington's getting the property are concerned, in acting on the suggestion, or that he was influenced by any promise or hope of reward or benefit.

Looking at all the testimony we think it was entirely insufficient to justify a judge in holding, in a proceeding of this character, that the motive of Rude was corrupt. In the face of a professional life of nearly thirty years without any stain upon it, in the absence of any effort at concealment and of all evidence of any of the considerations which usually influence men to do wrong, it is impossible to believe that the relator, or any one, would have undertaken to effect the settlement of a criminal charge of such indefinite and inconsequential character that none of its facts have been mentioned in all the testimony detailed in this record, for the mere purpose of corruptly relieving from prosecution a person hitherto unknown, and of no concern to him, or of defeating the criminal justice of the State. That a mistake has been made by him, and that there are circumstances which tend to indicate that he has done himself injustice in saying that he did not understand the charge to be one of a criminal nature, we do not deny, but that his conduct was criminal or corrupt has not been shown. His conduct is to be attributed rather to a misapprehension or inattention to his duty, than to a criminal intent.

We can not ignore all the testimony in this record which is favorable to the defendant, although the bulk of it may come from the lips of the relator and County Judge. Mary Murray does not deny what either of them says as to his interview with her. Sample and Washington were not called upon to contradict, if they could, what Rude says passed between him and them. The witnesses against Washington, whoever

they may have been, whom the County Judge says he examined, as he also says of Mary, were not summoned to test the truthfulness of that statement. The truthfulness and effect of the account which Rude and the County Judge have thus given can not be overcome and set aside by presumptions or inferences.

The case of State vs. McClaugherty, 33 W. Va., 250, is not in conflict with any of the conclusions reached in this opinion.

A peremptory writ is awarded, and it will be so ordered.