*In the Matter of the Disbarment of* W. B. WASH-
INGTON.

No. 16,311.

ATTORNEYS—*Disbarment.* The evidence and findings held to authorize and require the revocation of the license of the accused to practice law in this state.

Original proceeding in disbarment. Opinion filed June 11, 1910. Attorney's license revoked.

### STATEMENT.

CHARGES were presented against W. B. Washington, an attorney of the bar of this court. In substance it is charged (1) that he wrongfully altered a return upon an execution then upon the files of the district court; (2) that in an action of foreclosure he wrongfully assumed to represent a party which had not appeared nor authorized anyone to appear for it in the action, and obtained an order of the court for the payment of a sum of money to himself as attorney for such corporation, without its knowledge or consent, and never paid or attempted to pay it over, but applied it to his own use; (3) that he fraudulently altered the terms of a promissory note held by him, by inserting therein a stipulation relating to interest after it had been de-

livered to him; (4) that, while acting as trustee of a fund placed in his hands by two persons, he refused to pay it over to the one entitled to it according to the terms of the trust agreement, and wrongfully required that a sum of money claimed by his son against the person so entitled should be first paid; (5) that he wrongfully added the words "and interest" to the verification of an account in his hands for collection, without the knowledge or consent of the affiant thereto, in order to compel the debtor to pay interest not claimed by the creditor; (6) that, acting with his son as a partner in business as real-estate agents, he caused a conveyance to be made to his son of a title which he had been employed to secure for his client, and refused to permit the son to convey it to the client unless his demand for a much larger sum than had been agreed upon for his services, and much larger than they were worth, was paid; (7) that he obtained from a client a note and mortgage for $525 to use in procuring an assignment to a third party and extension of the time of payment of a judgment against this client, which he had obtained as attorney for the judgment creditor, and that he did not apply it to the purpose for which it was given, but wrongfully claimed it as his own; (8) that, being a man of violent and turbulent disposition, he has threatened the lives of others, and is a quarrelsome and dangerous man.

An answer was filed, and a commissioner was appointed to hear and report upon the issues so made. The evidence taken and the findings of the commissioner thereon are now presented for judgment.

The evidence on the part of the complainants, who are citizens of the district wherein the accused resides, tends to support the charges. The evidence on the part of the accused tends to disprove part of the charges, and is explanatory of his conduct in the matters specified in others. The findings of the commissioner upon the several specifications are in substance:

*In re* Washington.

(1) That real estate having been sold by a coroner upon execution for $250, the accused made out the return for the officer, stating that the sale had been made for $171.70. Some time afterward an abstracter in searching the records discovered a discrepancy between this return and the recital in the coroner's deed which stated that the sale had been made for $250, and, being called upon for an explanation, the accused went to the office of the clerk of the district court and altered the return then remaining on file so as to show that the sale had been made for $250, by interlineation and by writing over the words previously written, but that this was done openly and without fraudulent intent.

(2) That in a foreclosure action wherein he was attorney for the plaintiff the accused presented to the court and procured the allowance of an order of confirmation, wherein he had inserted a clause directing the payment to him, as attorney for the Nichols & Shepard Co., the sum of $139.89 out of the proceeds of the foreclosure sale, "to be paid on second mortgage." That corporation did hold a second mortgage on the property, but had not sought or obtained any judgment or order in the action, nor appeared therein, nor authorized the accused to do so, and had no knowledge of his having done so. He did not pay the money over to the corporation or make any effort to do so, but placed it in the hands of a friend. On the trial of this proceeding, about five years after he had received it, he paid it over to an attorney for the Nichols & Shepard Co., upon demand therefor, claiming that he had forgotten about it.

(3) That the charge relating to the alteration of the interest clause in promissory notes was not sustained.

(4) That W. B. Washington and his son, H. W. Washington, had been associated in business as real-estate agents at the law office of the former at Leoti until H. W. Washington went to Colorado, expecting to remain. One Chapman asked him to return to Leoti to

assist in a real-estate deal. This he did, and the trade, with his assistance, was made between Chapman and one Burkert, and a written contract stating its terms was prepared by the accused for them. Pursuant to the terms of the contract each party placed in the hands of W. B. Washington $200, to be held by him until its terms were complied with. To this sum $300 was afterward added. The amount, $700, was deposited by him in the bank, in a special account. The contract was carried out, when H. W. Washington and Chapman, who by the terms of the agreement was entitled to the fund, differed about the compensation the former was to receive for his services, whereupon W. B. Washington refused to turn over the fund to Chapman until the claim of his son for $700 was settled, saying that this was done that his son might not be compelled to sue for his pay. Thereupon Chapman and the son agreed that the latter should be paid $350, and W. B. Washington drew out the $700 and paid Chapman $350 and H. W. Washington $350. The value of the property disposed of by Chapman was over $8000.

(5) That the accused had a claim for collection against a Leoti merchant. The claim was mailed from St. Louis on October 30. On October 31 the debtor mailed his check to the creditor for the amount claimed. The check, however, was not paid until November 21, and the creditor urged the accused to collect the claim, and, on January 4 following, sent him a duly itemized and verified statement of the account, with instructions to sue. A demand was made for the money, and the debtor, without saying that he had sent the check, refused to have anything to do with the accused concerning it. Thereupon the accused sued upon the account, filing the itemized statement in court, but before doing so added an item of $12 for interest, and inserted in the affidavit verifying the account the words "and interest," after the statement therein of the balance due,

which alteration was made without authority, but without fraudulent intent. The debtor defended the action and recovered costs.

(6) That the accused was employed to look up a title for a client and procure a quitclaim deed for certain land. His son was at that time dealing on his individual account in town lots, and subsequently obtained a deed from the claimant of the lot which the accused had been employed to secure for his client, but he had no interest in the title so acquired by his son and no knowledge of the fact that the son had attempted to obtain, or had obtained, it until after it was done.

(7) The accused, as attorney for one Meisenheimer, obtained a judgment against one Cutler for over $1300. Cutler requested him to obtain from Meisenheimer extensions of time to pay the judgment, and extensions were accordingly obtained from time to time. It was agreed between Cutler, Meisenheimer and the accused that Cutler should pay to the accused the fee due him from Meisenheimer in obtaining the judgment. After several extensions had been made the accused informed Cutler that one Bassett would buy the judgment, and would be more lenient in its enforcement, and he procured for Cutler an assignment of the judgment to Bassett. About that time he settled with Cutler for his services and expenses, and took a note therefor for $525, payable to the order of Bassett. Bassett then refused to accept the assignment of the judgment, and thereupon assigned the note without recourse to the accused and returned the assignment of the judgment to Meisenheimer. Cutler was informed of the failure to sell either the note or the judgment to Bassett. The note was not paid when due, and a new note for $557, to the order of W. B. Washington, secured by a bill of sale of an elevator, was given in its place, and the mortgage securing the first note was released. These papers were placed in the hands of one Christy, and

53—82 KAN.

while in such custody Cutler commenced an action in the district court against the accused and Christy for their cancellation, on the ground that they had been obtained by fraud. Issues were joined in the case, and upon trial a special verdict was rendered in favor of Cutler and judgment was rendered upon the verdict and findings of the court for cancellation as prayed for. The question submitted to the jury and determined in that action was whether the note for $525 was executed under the circumstances and for the consideration claimed by Cutler or under the circumstances and for the consideration claimed by Washington, and the answer was that the transaction was as claimed by Cutler. The claim of Cutler was in substance that the note was given to procure an assignment of the judgment by Meisenheimer to Bassett and an extension of time thereon in the circumstances about as set out in the sixth charge made herein; that the note had not been applied to that purpose; that there was no other consideration for the note; and that it was not given in consideration of services, as claimed by the accused.

(8) That the accused is a man of quick temper, which he sometimes fails to control, and has had much trouble at different times with one of the relators, and also with the marshal of Leoti and with some others; that at times and probably when under the influence of intoxicating liquor he was very abusive and threatening in conduct and language; that he has bitter enemies, among whom is the relator referred to; that he had a quarrel with the city marshal over a dog fight, during which he displayed a pocketknife and the marshal a revolver, and that a crowd was attracted and much excitement ensued, after which the belligerents made up; that the respondent's most serious trouble has been with the relator before referred to, who was mayor of Leoti, the relator having made a practice of carrying a revolver and menacing the accused, who has

on two or three occasions made threats against the relator and has used language concerning him which for vileness and indecency is beyond the imagination of the ordinary individual, and wholly unjustifiable, and when under the influence of drink has also used very improper language regarding others with whom he was having trouble.

The commissioner concluded that the right of the respondent to practice law should be suspended for three months, and that he should pay one-half of the costs of the proceeding and the relators should pay the other half. In his opinion the commissioner said:

"I have some doubt as to the correctness of the conclusions of law; but fortunately that matter will be finally determined by the combined judgment of the seven judges of this court and does not rest upon the judgment of your commissioner. Each of the attorneys for the prosecution in the oral argument took occasion to disavow any personal feeling in this matter, and each stated in substance that he had known Mr. Washington for many years; that his conduct in court had always been unexceptionable and his treatment of the members of the bar had been universally that of a gentleman, . . . and, however justifiable this prosecution may have been, it was evident to me that it was prosecuted with malice and a spirit of revenge, and, in my judgment, it would not conduce to the public welfare that either party should boast of an unqualified victory; nor would it do for the court to ignore, or by implication sanction, the conduct of Mr. Washington. His alteration of the record in the office of the clerk of the district court was reprehensible, although not done with fraudulent intent. No attorney should alter a record of the court without an express order from the court or judge, and such order should be reduced to writing and made a part of the records of the court. The conduct of Mr. Washington in receiving the $139.89, as specified in the second charge, seems inexcusable in the first instance, and his failure to discover the parties to whom the money belonged and properly account for it within a reasonable time increases his misconduct in connection with the matter. His personal conduct, as disclosed by the testimony introduced

*In re* Washington.

under the eighth charge, should be condemned by all right-thinking men. I do not believe that the bar of Kansas requires that any example should be made for their benefit or that the profession will be disgraced by association with Mr. Washington. The evidence in this case shows that his conduct and practices have been below the average standard, and yet, in my opinion, the punishment of disbarment is too severe for the offenses by him committed, and a suspension of his right to practice for a limited time and the division of the costs will come nearer promoting exact justice."

*D. A. Banta, J. S. Simmons,* and *R. D. Armstrong,* for the accusers.

*M. B. Nicholson, Lee Monroe,* and *George A. Kline,* for the accused.

*Per Curiam:* The alteration of the return of an officer after it is duly filed in the clerk's office, without any order or sanction of the court, is so dangerous to the rights of the parties and so perilous to public records that comment upon it seems hardly necessary. The practice of applying for and obtaining an order for an amendment to be made by an officer, where an amendment is proper, is so usual that it must have been well known to the accused. The records of a court would be of little value if subject to alteration without leave by attorneys, who, because of the confidence reposed in them as officers of the court, have opportunities to do so. That the alteration in this instance was made without fraudulent intent palliates, but does not justify, the act.

The manner in which the $139.89 was obtained and its retention for over five years without even an effort to pay it over to the party in whose name it had been claimed are alike reprehensible. That party had not appeared in the action, nor in any manner authorized the accused to claim or receive money in its behalf. It was a surplus fund remaining after the satisfaction of a judgment, and if the court had been informed of the true facts a proper order would have been made for its

disposition, but not the one that was prepared and presented to the court by the accused.

The findings exonerate the accused from the third charge, and also from the sixth. With respect to the latter it seems unfortunate that the son, whose office appears to have been with the father, and with whom the father's name had been associated in the real-estate business, purchased and held adversely a title which the father as an attorney had been employed to procure for a client. Although this was done innocently and without the father's knowledge, the outward circumstances were such that the complainants probably were mistaken as to the real nature of the transaction when they made the charge.

The reason given by the accused for not paying over a trust fund in accordance with the agreement upon which he held it until his son's claim was first paid, namely, that he wished to save his son from a lawsuit, although it may appeal to parental feelings, was not a sufficient excuse for a trustee for others. So far as the findings show, the son's claim was just, but the father had not been appointed to judge of that matter, and the trust agreement made no provision for its payment.

The addition of the item of interest in the account, and the insertion of the words "and interest" in the affidavit verifying it, referred to in the fifth finding, unlike the alteration of the coroner's return, were done before the bill of particulars to which it was attached had been filed. The gravamen of the charge consists in the fact that the verification was affected by the addition. The affiant had not sworn to the correctness of any claim for interest, but the added words made it appear that he had done so. The account, therefore, as filed, so far at least as the item of interest is concerned, was not a verified account, but as it was made to appear so the plaintiff in that action might have obtained an advantage to which he was not entitled. (Jus. Civ. Code, § 84.) While no injury resulted in

the particular case, such a practice can not be approved.

In considering the eighth finding, upon the charge of offensive language and quarrelsome conduct, the following quotation from an opinion of this court seems pertinent:

"True it is that a man is required to show upon his admission to the bar that he is of good moral character. His license to practice after he is admitted, however, will not be revoked on account of objectionable personal habits until it is shown that such habits have rendered him unable to attend properly to his duties as a lawyer, or have rendered him unworthy of the great trust and confidence generally accorded to the members of the profession, or that such habits have become so bad as to scandalize his profession or the courts in which he practices." (*In re Elliott*, 73 Kan. 151, 157.)

In the opinion of the commissioner the language and conduct referred to were provoked, in part at least, by that of two of the complainants. It is quite true that the speech and conduct of a man must be viewed in the light of any provocation given by others, and of all the attendant circumstances. Still, the complainants were not on trial. Their conduct, except so far as it explains the conduct of the person charged, or affects their own credibility, is not very important now in this case, if sufficient cause existed to warrant the proceeding. That a lawyer should use language which the commissioner reports is so regrettable a fact that we refer to it only because duty requires it, and an omission might be thoughtlessly construed as an indication of indifference on the part of the court.

It will be observed that the finding of the district court, upon the trial of the action between Cutler and Washington for the cancellation of securities, was contrary to that of the commissioner's finding upon the seventh charge. In view of the findings, however, upon other charges, which are amply supported by the evi-

dence, it is not deemed necessary to review the evidence relating to that one.

We quite agree with the commissioner that an example is not required for the benefit of the legal profession, for happily offenses of the nature specified in these charges are rare indeed, and the bar has, as it fully deserves, the confidence of the people; yet in order that this confidence may continue unabated, and because the due administration of justice requires it, courts will not hesitate to apply sufficient correctives whenever willful violation of duty is shown.     (*In re Norris,* 60 Kan. 649; *In re Smith,* 73 Kan. 743.)

"If the accused has been shown to be guilty of such misconduct that the public should be protected from the implied recommendation for integrity with which he is armed as a member of the bar, that recommendation should be withdrawn and he should be disbarred." (*In re Elliott,* 73 Kan. 151, 159.)

The care and patience of the commissioner called to perform an unpleasant duty, and the kindly manner in which it was performed, merit our grateful approval, but the penalty recommended seems to the court insufficient, and as there was good cause for the proceeding no costs should be imposed upon the complainants.

Believing that the evidence and the facts reported authorize and require it, the judgment of the court is that the license of the accused to practice law in this state be revoked, and that he pay the costs.