(No. 6546. December 5, 1938.)

In re D. L. CARTER.

[86 Pac. (2d) 162.]

A. L. Freehafer, George Donart and S. E. Blaine, for Petitioner.

GIVENS, J.—Disciplinary charges were filed against D. L. Carter, a member of this bar. The commission, after a prosecution before it by a special prosecuting committee, found petitioner guilty of a violation of his duties as an attorney, and recommended a suspension of one year and assessment of $340.20 costs of the proceedings against petitioner

(secs. 3–408, 3–412, I. C. A.) who filed a petition for review thereof.

The charge involves two separate situations: First, for some years prior to July 6, 1933, Mrs. Lelia H. Thompson, then Buchanan, had been petitioner's intermittent client and he had, both as attorney and agent, handled various business for her. On that date petitioner arranged a loan for Mrs. Thompson of $265 to one Abernathy, who gave her a note secured by a chattel mortgage on twelve head of cattle and three horses. Thereafter, the note not having been paid when due, without Mrs. Thompson's knowledge or consent, petitioner took possession of the cattle and horses from Abernathy, giving him a full release as follows:

"Mr. Eddie Abernathy:

"This is to make a record of our agreement that I take the fourteen head of cattle and calves covered by mortgage and three horses in full settlement of note secured by the mortgage. You can keep the horses & work them until you have put in your crop.

"Sept  11  1934.

"D. L. CARTER."

He did not notify Mrs. Thompson of so doing but continued to lead her to believe the note had not been paid, and she did not find out the true facts of the situation until she employed Cunning & Brewster, lawyers of Redmond, Oregon, and Herman Welker, an attorney at Weiser, to collect the note and mortgage, and Mr. Welker was told by Mr. Abernathy that he had paid the note, as shown by Committee's Exhibit 11, as follows:

"I am now informed by Welker that Abernathy has a receipt showing that he paid you the note in full during September, 1934. Mrs. Thompson tells me that as late as March 1935 you informed her that Abernathy would be ready to take up his note in a few days. You did not tell her you had collected the note nor did you pay her the proceeds of your collection. You as an attorney know that you had no right to collect any note unless you had it in your possession."

Various offers of compromise or partial payment were made by petitioner but no complete tender until after these disci-

plinary proceedings were commenced, then full payment was made and accepted. The record discloses Mrs. Thompson was put to considerable expense to secure her money, but the exact amount, and whether she was reimbursed for them is not disclosed by the record, though it details negotiations to that end.

Petitioner's only excuse for not notifying Mrs. Thompson was in substance that he had been ill, she would have worried if she had known he had taken the security (she evidently had just cause so to do) and that he felt himself morally if not legally obligated to secure her loss, but that he had no explanation even satisfactory to himself.

Petitioner was unable to testify when such agreement (of being responsible to make good any loss for loans made by him) was made, and Mrs. Thompson denied that such agreement had been made and the commission found that there had been none.

The second situation is that about May 11, 1933, Mrs. Thompson delivered her check for $240 to petitioner with the understanding that it was to be applied on a loan which she was making to one Ed. Buchanan. Petitioner accepted the check, indorsed it and deposited it to his own account, and finding that he had other sufficient funds belonging to Mrs. Thompson to complete the Buchanan loan, the funds represented by the $240 check were never applied on the loan, but were drawn on by petitioner as his own funds. About October 7, 1933, petitioner submitted a written statement to Mrs. Thompson purporting to be a complete accounting of transactions between them, and noting that she had not been given credit for the $240 check she called his attention to the same. At first he stated that he did not remember having received the check, but upon her presentation of the check with his indorsement he agreed to pay her for it, and some months later gave her his note therefor.

The entire conduct of petitioner in his dealings with Mrs. Thompson indicates great laxity and carelessness, and a positive violation of 3–301 subsecution 5, I. C. A., and Rule 175 of the Supreme Court and Board of Commissioners of the Idaho State Bar, and while the evidence does not defi-

nitely establish willful misconduct or fraudulent intent it clearly shows deceit and a breach of the confidential relationship between attorney and client—a fiduciary relationship of the highest character, binding him with the strictest accountability and fidelity to his client's interest. (*Marsh v. State Bar of California*, 210 Cal. 303, 291 Pac. 583; *State ex rel. McCourt v. Farrin*, 81 Or. 489, 160 Pac. 124; *In re Bailey*, 30 Ariz. 407, 248 Pac. 29; *San Francisco Bar Assn. v. McClellan*, 40 Cal. App. 630, 181 Pac. 231; *People ex rel. Colorado Bar Assn. v. Webster*, 31 Colo. 43, 71 Pac. 1116; *In re Veeder*, 11 N. M. 43, 66 Pac. 545; *Schaffer v. State Bar of California*, 212 Cal. 367, 298 Pac. 994; *State Board of Law Examiners v. Brown*, 42 Wyo. 108, 290 Pac. 1013.)

██ Bearing in mind that the purpose of suspension and disbarment proceedings is not to punish, but to protect the public from those who are found unfit to perform the duties of an attorney at law (*In re Kerl*, 32 Ida. 737, 188 Pac. 40, 8 A. L. R. 1259; *In re Burns*, 55 Ida. 190, 196, 40 Pac. (2d) 105; *In re Wourms*, 31 Ida. 291, 170 Pac. 919) the evidence justified the bar commission in taking disciplinary measures against petitioner and supports its findings, but because the evidence fails to show willful and fraudulent intent, and in consideration of petitioners apparent illness during the time the misconduct occurred, we feel the recommendatory order of the commission should be modified to reduce the period of suspension to four months commencing from the judgment herein becoming final (*Lyders v. State Bar of California*, 12 Cal. (2d) 261, 83 Pac. (2d) 500; *In re Mitchell*, 189 Wash. 612, 66 Pac. (2d) 300.)

██ Petitioner contends no costs at all may be assessed, but there is authority sustaining the allowance of costs in proceedings of this character under statutes similar to 12–101 I. C. A. (*In re Washington*, 82 Kan. 829, 109 Pac. 700; *In re Wilcox*, 90 Kan. 646, 135 Pac. 995; *In re Connell*, 79 Okl. 212, 192 Pac. 546; *In re Hanson*, 48 Utah, 163, 158 Pac. 778; *In re Barclay*, 82 Utah, 288, 24 Pac. (2d) 302; *In re Zinn*, 39 N. M. 161, 42 Pac. (2d) 776; *In re Hanson*, 101 Mont. 490, 54 Pac. (2d) 882.) The assessment of costs, how-

ever, will be reduced to $100. (*Simmons v. Simmons*, 23 Ida. 485, 130 Pac. 784.)

It is therefore ordered and adjudged that petitioner be and hereby is suspended from the practice of law for four months commencing from the time this judgment becomes final and pay $100 of the costs of the proceedings herein.

Holden, C. J., and Ailshie, J., concur.

Morgan, J., deeming himself disqualified, did not sit at the hearing nor participate in the opinion.

Petition for rehearing denied.

BUDGE, J., Dissenting.—*In liminie*, the rule announced by this court in *In re Baum*, 32 Ida. 676, 186 Pac. 927, is as follows:

"An attorney against whom disbarment proceedings are instituted is entitled to have the charges fully stated, and is not required to defend against or explain any matter not specified in the charges."

This same rule applies to suspension and disciplinary proceedings. Under the above rule petitioner should not have been called upon to answer or defend against any matter not charged. Neither can he be held accountable for any charge not specified, nor for his failure to explain or justify the same.

An examination of the complaint discloses that petitioner is charged with certain serious matters upon which no proof was offered, and that he was specifically charged with having on the first day of July, 1933:

"made a loan for Lelia H. Buchanan, (Now Thompson) to one Edward Abernathy in Washington County, Idaho, taking a promissory note of the said Edward Abernathy to Lelia H. Buchanan, dated at Weiser, Idaho, July 1, 1933, for the sum of $265.00, payable one year after date to Lelia H. Buchanan or order, with interest at 8% per annum; which said note was secured by chattel mortgage of the same date, made by Edward Abernathy as mortgagor to Lelia H. Buchanan, as mortgagee, covering fourteen head cattle and three horses, together with all the increase thereon and covering also all

hay grown during the season of 1933, (on described real estate)''

''That thereafter, in the month of May, 1934, the said Edward Abernathy, mortgagor paid the said D. L. Carter, for the mortgagee, the sum of $68.00 to apply on said note and mortgage, but that the said D. L. Carter reported only the sum of $48.00, he the said D. L. Carter retaining $20.00, which he neither reported to nor paid to, Lelia H. Buchanan, his client.''

At this time it may be pertinent to observe that the record does not show that the sum of $68 was paid by Abernathy to petitioner, but on the contrary that no money in any amount was paid by Abernathy to petitioner. It is further alleged:

''That in the early part of September, 1934, Abernathy advised Carter that he did not have sufficient hay and feed to care for said mortgaged livestock during the winter and asked the said D. L. Carter to furnish the necessary feed or take the stock; that thereafter, on the 11th day of September, 1934, said D. L. Carter, in lieu of foreclosure, took possession of said livestock. That on the 11th day of September, 1934, at the time said D. L. Carter took possession of said horses and cattle from Abernathy, he gave to the said Abernathy the following receipt:

'' 'Mr. Eddie Abernathy: This to make a record of our agreement that I take the 14 head of cattle and calves covered by mortgage, and 3 horses, in full settlement of the note secured by the mortgage. You may keep the horses and work them until you have put in the crops. September 11, 1934, D. L. Carter.' ''

Among other material allegations it is alleged in the complaint that in March, 1935, Mrs. Thompson, then Buchanan, called on petitioner to obtain settlement of the Abernathy note, and she alleges, that when she called on petitioner she did not know he had taken possession of the livestock and given Abernathy the above-quoted receipt. It is further alleged that petitioner failed to report to Mrs. Thompson that he had taken said mortgaged property or that he had given said receipt, and:

"But disregarding his duty to his client the said D. L. Carter advised his client, Lelia H. Thompson that Abernathy would pay the note in a few days."

The gist of the charge is therefore that petitioner, sustaining the relationship of attorney and client with Mrs. Thompson, took into his possession certain mortgaged property, without authority from Mrs. Thompson and without notifying her, in payment of the indebtedness due from Abernathy to Mrs. Thompson and gave his receipt therefor. There are allegations in the complaint that Mrs. Thompson employed attorney Welker of Weiser to collect the Abernathy note and that Welker discovered that petitioner had taken possession of the mortgaged property and given the receipt above referred to. It is further alleged that a demand was made upon petitioner for payment and for the delivery of the livestock covered by the mortgage, and:

"That thereupon, D. L. Carter made written tender on the balance due on said note, which tender was refused and the client through her attorneys, demanded the delivery to her of said property taken by D. L. Carter in satisfaction of the mortgage advising said D. L. Carter that the client was entitled to said property and that said D. L. Carter was not entitled to keep said property of the value of approximately three times the amount of said note, thereby profiting by his own conduct.

"Thereupon, said D. L. Carter tendered only a portion of said stock and property and demanded in addition thereto that the client pay him for the feed and the care of said stock; all of which said offers were refused by the client and her attorneys,"

The pertinent facts, briefly stated, in proof of the foregoing allegations of the complaint are substantially as follows: On or about July 1, 1933, Abernathy, a client of petitioner, sought through petitioner to make a loan for $265. Petitioner contacted Mrs. Thompson and obtained the loan above referred to. The relationship of attorney and client did not, at the time of this transaction, exist between petitioner and Mrs. Thompson, petitioner making no charge against Mrs. Thompson for services rendered in connection

with the loan, but collected his fees from Abernathy and so informed her. While petitioner had transacted more or less business at different times for Mrs. Thompson, over a long period, he was not under an annual retainer and there existed no continuous relationship of attorney and client between them. The record is without dispute that petitioner, without authority from Mrs. Thompson, possessed himself of the mortgaged property, gave the receipt, and failed to notify her that he had taken possession of the property. Such conduct was reprehensible and unethical, but did not, as stated in the majority opinion: ''definitely establish (d) wilful misconduct or fraudulent intent.'' Suspicion or inferences that may be drawn from the record are not sufficient to disbar or suspend an attorney and expose him to disgrace and beggary. It must be a clear case and must be proved by a preponderance of evidence. *The State of Florida ex rel. Rude v. W. B. Young,* 30 Fla. 85, 11 So. 514. There must be fraudulent, corrupt and bad motive clearly shown before disbarment or suspension could follow. The record fails to show that the taking of the mortgaged property or any other act charged against petitioner was done with such fraudulent, corrupt and bad motive necessary to be shown before disbarment or suspension could follow. (*State ex rel. Fowler v. Finley,* 30 Fla. 325, 11 So. 674, 18 L. R. A. 401.) It is said in the majority opinion:

''It clearly shows deceit and a breach of the confidential relationship between attorney and client.''

With this statement I am not in accord for the reason that the relationship of attorney and client did not exist, and furthermore the taking possession of the livestock covered by the chattel mortgage was open and not deceitful, although unjustifiable.

The evidence discloses that Abernathy went to petitioner in September, 1934, and informed him that he had no hay and no pasturage to feed or care for the mortgaged property and that it was up to petitioner to furnish the feed or take possession of the mortgaged livestock. In this situation, Mrs. Thompson being without the state, on September 11, 1934, petitioner took possession of the mortgaged property and gave the receipt. The record shows that petitioner and

Abernathy made every effort humanly possible to sell the mortgaged property to pay the note, but without avail, excepting that three head of cattle were sold for $40, and the amount was indorsed on the note. Petitioner offered as an excuse for taking possession of the mortgaged property that he felt under legal and moral obligation to see that Mrs. Thompson received all the money due upon her note and that his purpose at all times was to sell the mortgaged property for enough to pay the Abernathy note and interest without causing her any loss, and to save Abernathy from foreclosure or other expenses incident to the closing out of the transaction. The evidence is undisputed that petitioner did not appropriate to his own use any of the mortgaged property; that he did not seek to dispose of or sell the same for any purpose other than to pay the note, and that he did not profit by reason of the taking, but on the contrary was put to some considerable expense. Numerous efforts were made by petitioner to settle, both with Mrs. Thompson and her attorneys. Petitioner tendered $300 in payment of the Abernathy note, there then being due approximately $225, and he, petitioner, to retain possession of the mortgaged property. This offer was refused. Petitioner thereupon tendered all of the mortgaged property still in his possession in payment of the Abernathy note, less the cost of feed, care and transportation of the same while in his possession. This offer was likewise refused. Petitioner took the position that he was entitled to be reimbursed for these expenses. An action was filed against petitioner by Mrs. Thompson to replevin the mortgaged property. Before the trial a compromise was reached and the Abernathy note discharged by petitioner paying the balance due on the note, interest, attorneys fees and court costs.

The question therefore arises, in view of the recitals above made and other facts and circumstances appearing in the record in mitigation of petitioner's conduct, was his conduct so unprofessional and unethical as to justify his suspension for a period of one year and the imposition of costs in the amount of $340 as recommended by the state bar commission to the court? The majority opinion modifies the recommendation,

reducing the punishment to be inflicted to suspension for four months and the imposition of costs in the amount of $100.

The majority opinion does not go far enough. It should set aside the entire recommendation of the bar commission and in lieu thereof severely reprimand petitioner for his negligence and unethical conduct in the taking of the mortgaged property, particularly since he had not made known to Mrs. Thompson the fact that he had done so and the further fact that he had given a receipt attempting to discharge Abernathy from the indebtedness. It might be here observed that the receipt did not discharge Abernathy and the taking of the mortgaged property by petitioner did not deprive Mrs. Thompson of her lien. She could at any time have foreclosed her chattel mortgage although the livestock was in the possession of petitioner. The result of the transaction between Abernathy and petitioner amounted to nothing more than petitioner assuming, as between himself and Abernathy, the indebtedness due from Abernathy to Mrs. Thompson. Petitioner's conduct, however, in not advising Mrs. Thompson that he had taken the mortgaged property into his possession and that he had relieved Abernathy of the indebtedness to Mrs. Thompson was a matter which the state bar commission was justified in investigating, and was such conduct as merits severe criticism, but not suspension or disbarment. In *In re Baum, supra,* the following language is found:

"Under charges of this kind, where it appears that the accused acted in good faith, without improper or corrupt motives, and it is not shown that any injury resulted to his client, cause for disbarment does not exist."

The additional statement is made that:

"The power of disbarment is one which should be exercised with caution, and with due regard to the serious consequences which may follow from an exercise of the power."

In *In re Wourms,* 31 Ida. 291, 170 Pac. 919, the following rule is announced, quoting from 6 C. J. 581:

"The power (of disbarment) is not an arbitrary and despotic one to be exercised at the pleasure of the court or because of passion, prejudice or personal hostility; it is rather one to be used with moderation and caution, in the exercise

of a sound judicial discretion, and only for the most weighty reasons, and upon clear legal proof.''

Then follows in the body of the opinion the following pertinent language:

''The consequences visited upon an attorney by his disbarment, degrading him, as it does, in the estimation of his fellowmen and depriving him of the means of making a livelihood to which he should have, and probably has, devoted many years of arduous study and expensive preparation, are so severe that it should only be resorted to in cases of necessity where there is no reasonable ground to believe the imposition of a judgment less severe will adequately protect the public, the courts and the profession.''

Petitioner was admitted to this court and all courts of record of this state on September 18, 1911, and for 27 years had practiced his profession and held various important public offices. There is not a scintilla of evidence in the record that petitioner's acts of professional conduct during all of the years he has practiced have been anything but honorable and ethical, other than the one here under consideration. The one and only charge made in the complaint upon which he is called to answer is his taking of the mortgaged property, without the authority of the mortgagee and without informing her of having done so, and retaining the same in his possession. Clearly his conduct cannot be excused, but the record negatives willfulness, fraudulent intent, corruption, bad motive, or design to personally profit by his conduct, which being true, his conduct is not of such a character as justifies the severe penalty imposed in the majority opinion.

With reference to what is designated in the majority opinion ''the second situation,'' the $240 check delivered to petitioner by Mrs. Thompson on May 11, 1933, there is no charge in the complaint with reference thereto and therefore petitioner was not called upon to offer any explanation and the state bar commission had no authority to make any investigation thereof. Suffice it to say there is ample evidence in the record to justify the conclusion that while this $240 check was given by Mrs. Thompson to petitioner to apply on a loan to one Ed. Buchanan, the loan was made direct by Mrs.

Thompson and not by petitioner. According to the testimony of Mrs. Thompson herself, the $240 check was given to petitioner while he was ill, suffering excruciating pain as a result of sciatic rheumatism, the check was indorsed and deposited to petitioner's account by his stenographer, Mrs. Hansen, and when petitioner was convinced that he had received the $240, which had not been made to appear on the statement rendered to Mrs. Thompson of the business transactions between them, a full settlement was made, Mrs. Thompson taking petitioner's note, which was satisfactory to her at the time. The note was subsequently paid. Likewise all other indebtedness due Mrs. Thompson was paid, and so far as the record discloses she suffered no monetary loss.

It is quite clear to my mind from the record that in so far as one Brewster, an attorney from a foreign jurisdiction, is concerned, his interest was not to purge the bar of an unprofessional and unethical lawyer, but to use the state bar commission as a means to enrich himself by a substantial attorney fee. It is interesting to read his correspondence addressed to petitioner under date February 6, 1936, wherein the following language is found:

"I did, as you know, prefer charges against you before your Bar Association. . . . . However, if you can arrange any plan, by which you can pay up the Abernathy note in full, and agree to pay your obligations to Mrs. Thompson in full or secure the obligation, and pay the expenses she has been put to, *I would gladly withdraw any charges if she so requests.*"

Under date of December 1, 1935, in a communication to petitioner, Brewster uses the following language:

"I can promise you that action will be brought on the notes, that a complaint will be filed with the State Bar Asso. and with the prosecuting attorney and that we shall prosecute not only vigorously but bitterly unless you make full, complete and immediate restitution. I do not know if your state bar asso. will prosecute charges but I do know that if they do not a complete report of the entire matter is going to be given to the press of Weiser, Boise and Portland and if I can get your prosecuting attorney to act we will burn you up.

"I am not bluffing about this and I have no sympathy for you. It is going to do you no good to write that you have been sick, busy or that you are hard up. If you are hard up you had better borrow the money *or steal it from some one who* will be more lenient than I am going to be. . . . .

"I am not sure that I can get either the district attorney or the bar association to act . . . . if I were living in Idaho I would feel the same way about it but fortunately I do not live in Idaho *and I intend to exact the pound of flesh."*

It does seem unjust to me that petitioner should be suspended from the practice of law and at the same time required to pay a fine. The presumption might be justified that his ability to pay the fine would depend upon his right to practice his profession. I cannot convince myself that the judgment imposed is not too severe and feel that a lesser punishment would adequately protect the public, the courts and the profession.