560 P.2d 886

**In the Matter of Jay L. DEPEW, Attorney.**

**No. 12349.**

Supreme Court of Idaho.

March 4, 1977.

---

William J. Tway, Tway & Rowe, Boise, for petitioner.

J. William Hart, Jerome, for Idaho State Bar Assn.

McFADDEN, Chief Justice.

On April 18, 1975, Jay L. Depew was suspended by this court from the practice of law in the State of Idaho for a period of ninety days, and until further order of this court. Depew has never been reinstated.

Subsequent to this suspension, additional complaints against Depew were filed with the Committee on Discipline of the Idaho State Bar. On December 12, 1975, a hearing on certain of these alleged violations was held before the Discipline Committee. The Committee's findings of fact, conclusions of law and recommendatory order, as amended and adopted by the Board of Commissioners of the Idaho State Bar is now before this court.

In the proceedings below, the incidents giving rise to the charges against Depew acquired informal designations as follows: the "Nipko" matter, the "CM&R" matter, the "Round-up" matter, the "Jesser" matter, and the "Sunmountain Condominium" matter. We will adopt these designations for purposes of this opinion.

The Nipko, CM&R and Roundup matters all involve allegations by the Prosecuting Committee of the Idaho State Bar that Depew continued to practice law after being suspended by this court. The Jesser matter and the Condominium matter, as well as an additional charge in the CM&R matter, concern alleged additional violations of the Disciplinary Rules of the Canons of Ethics of the Idaho Code of Professional Responsibility.

## THE NIPKO MATTER

On June 7, 1973, Depew incorporated his law practice in the state of Idaho as a professional service corporation, Jay L. Depew, Chartered. On March 25, 1975, after Depew had been served with notice of his suspension, Jay L. Depew, Chartered, filed a complaint in the District Court of the Fifth Judicial District of Idaho, Twin Falls County, against Dr. Roy A. and Flossie May Nipko. The complaint sought recovery for attorney's fees for services that Depew Chartered was alleged to have had performed for the defendants over a period of time from the fall of 1973 through January of 1975.

At the top of the complaint appeared the following:

JAY L. DEPEW, CHARTERED
Counselor at Law
P. O. Box 961
Twin Falls, Idaho 83301
Telephone: 734-3000

A similar legend appeared in the margin of each page of the complaint and the complaint was signed by Jay L. Depew for Jay L. Depew, Chartered. Other documents subsequently filed in the Nipko suit also contained this heading, legend and signature although Depew later began to sign as "president" of Depew Chartered, the legend disappeared from the margin and the words "Counselor at Law" were not included in some of the headings.

The Discipline Committee found that Depew's actions in the Nipko suit constituted the unauthorized practice of law, rejecting Depew's contentions that he was in effect permissibly acting pro se and/or that Depew Chartered was entitled to sue, with Depew signing as president, for the value of the services he performed prior to being suspended. The Committee found that Depew had violated I.C. § 3–104 [1] and I.C. § 3–420 [2] and also the suspension order of this court.

## THE CM&R MATTER

On July 31, 1975, CM&R, Inc., an Idaho corporation, filed suit in the District Court

1. "3–104. Practicing without license a contempt—Exception.—If any person shall practice law or hold himself out as qualified to practice law in this state without having been admitted to practice therein by the Supreme Court and without having paid all license fees now or hereafter prescribed by law for the practice of law he is guilty of contempt both in the Supreme Court and district court for the district in which he shall so practice or hold himself out as qualified to practice. Provided, that any person may appear and act in a magistrate's division of a district court as representative of any party to a proceeding therein so long as the claim does not total more than $300, and so long as he or his employer has no pecuniary interest in the outcome of the litigation, and that he shall do so without making a charge or collecting a fee therefor."

2. "3–420. Unlawful practice of Law—Penalty. —If any person shall, without having become duly admitted and licensed to practice law within this state or whose right or license to practice therein shall have terminated either by disbarment, suspension, failure to pay his license or otherwise, practice or assume to act or hold himself out to the public as a person qualified to practice or carry on the calling of a lawyer within this state, he shall be guilty of an offense under this act, and on conviction thereof be fined not to exceed five hundred dollars, or be imprisoned for a period of not to exceed six months, or both, and if he shall have been admitted to practice law he shall in addition be subject to suspension under the proceedings provided by this act.

of the Fifth Judicial District of Idaho, Blaine County. The complaint was signed by Jay L. Depew as secretary of the corporation. The Discipline Committee concluded that these actions also constituted the unauthorized practice of law and that Depew had again violated I.C. § 3–104, I.C. § 3–420 and the suspension order. Depew had argued that filing suit as secretary of a corporation is merely an ineffective act as opposed to constituting the unauthorized practice of law.

Also in connection with the CM&R suit, Depew submitted an order to show cause to the Honorable Douglas O. Kramer, district judge of the above named court, for his signature. Judge Kramer refused to sign the order on grounds that Depew had been suspended and also because he did not believe that a secretary of a corporation could represent that corporation. Despite this refusal, Depew proceeded to have the unsigned order to show cause served upon the defendants. The Discipline Committee concluded that by causing an unsigned order to show cause to be served, Depew had violated sections 1–102(4) and (5) of the Disciplinary Rules.[3]

## THE ROUNDUP MATTER

The Prosecuting Committee also alleged that Depew was practicing law in contravention of his suspension by representing a limited partnership known as "Roundup." The complaint alleges that from or about September 5, 1975, to September 25, 1975, Depew acted as attorney for Roundup in the sale of real property and other legal matters. The prosecution claims that the following actions by Depew constituted the unauthorized practice of law: determining what items needed to be paid to determine good title; investigating facts and conditions of title and making sure title was clear; investigating the procedure required to transfer a liquor license and doing so;

"Probably" preparing the deeds; receiving the proceeds of the sale, distributing the same with an accounting and operating a trust to accomplish this; settling lawsuits; generally doing all things necessary to closing a sale; and receiving $1,500 designated as attorney's fees.

Depew, on the other hand, maintained that he did no more, or even less, than would an employee of a bank or title insurance company. The Discipline Committee determined that there was some doubt whether Depew's actions constituted the practice of law and concluded that there was no basis for disciplinary sanctions with regard to the Roundup matter.

## THE JESSER MATTER

The Discipline Committee reached the same conclusion in regard to the fourth matter. The complaint against Depew alleged that in the fall of 1971, George D. Jesser and Gerald W. Pickett formed a partnership to purchase and farm agricultural land. Jesser allegedly represented to Pickett that he had paid $11,000 down in cash on a certain piece of property and that Pickett would need to contribute an additional $4,000 to fulfill the $15,000 down payment. Pickett paid this $4,000 and advanced an additional $3,500 to Jesser to supposedly even their respective cash outlays at $7,500 each. Jesser, however, had actually paid only $1,000 down.

This was not brought to Pickett's attention until some two years later during the trial of an accounting suit between the two partners. The district court, in its amended memorandum decision in that case, found that Jesser owed a fiduciary duty toward his partner, Pickett, and that his attempts to take advantage of Pickett with book entries indicating this capital account credit to be $10,000 greater than his actual contributions constituted fraud of the "most perfidious type."

---

3. "DR 1–102 Misconduct.

  "A lawyer shall not:

  \* \* \* \* \* \*

  (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

  (5) Engage in conduct that is prejudicial to the administration of justice.

  \* \* \*."

The complaint further alleged that Depew, who represented Jesser in the accounting suit, became aware of the fact that Jesser had paid only $1,000 of the $11,000 in cash sometime prior to the accounting trial, in December of 1974 or January of 1975. The prosecution maintained that Depew's failure to reveal this discrepancy to either Pickett or the court constitutes a violation of DR 7-102(A)(3), (4), (5), (6) and (7) and 102(B)(1) of the Code of Professional Responsibility.[4] The Discipline Committee, however, concluded that it was not clear from the record whether Depew became aware of this discrepancy before or after it was divulged at trial and that there was therefore no basis for disciplinary action in this matter.

## THE SUNMOUNTAIN CONDOMINIUM MATTER

The final set of circumstances leading to the charges against Depew concerns his involvement in transactions with respect to the sale and financing of certain condominiums. The Prosecuting Committee's complaint alleges as follows: On July 13, 1972, James Privette, a client of Depew's, purchased from Le'Car Development Corporation a condominium unit in Ketchum, Idaho, in a complex known as Building No. 1, and commenced to live in it. However, the sales agreement and warranty deed from Le'Car to Privette, among other documents, referred to a condominium unit in Building No. 2, which does not exist. In August of 1972, First Security Bank of Idaho, N. A., which was financing Privette's purchase of the condominium unit, recorded a deed of trust on the non-existent unit in Building

No. 2 to perfect its security interest. On November 24, 1972, Sawtooth Title Company issued title insurance policies on the unit in Building No. 2.

The complaint alleges further that Sawtooth then discovered the mistake which had been made and, shortly after December 22, 1972, informed Depew, who allegedly represented to Sawtooth that he would remedy the error. In June of 1973, Depew became trustee of Le'Car and signed a deed transferring the unit in Building No. 1 to CM&R, Inc., a corporation in which Depew had a substantial interest. On December 3, 1973, an attorney for Sawtooth again requested, to no avail, that Depew take action to correct the errors in the respective documents. On December 12, 1973, CM&R borrowed $18,000 and on December 28, gave as security therefore a deed of trust on the unit in Building No. 1.

The Discipline Committee concluded that the conduct of Depew with respect to the condominium transactions constitutes a flagrant violation of DR 1-102(4) and (6) of the Code of Professional Responsibility.

## OPINION

■ Although this court is not bound by law to accept the findings of the Committee on Discipline and recommendations of the Board of Commissioners, such recommendations and findings are entitled to be given great weight and the burden is on the petitioner to show that the findings are not supported by the evidence or that the recommendation of the Board is erroneous. *In re Bowen*, 95 Idaho 334, 508 P.2d 1240

4. "DR 7-102 Representing a Client Within the Bounds of the Law.
   (A) In his representation of a client, a lawyer shall not:
   \*    \*    \*    \*    \*    \*
   (3) Conceal or knowingly fail to disclose that which he is required by law to reveal.
   (4) Knowingly use perjured testimony or false evidence.
   (5) Knowingly make a false statement of law or fact.
   (6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
   \*    \*    \*    \*    \*    \*
   (B) A lawyer who receives information clearly establishing that:
   (1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal.
   \*    \*    \*."

(1973). The petitioner herein, Jay Depew, has not met this burden and we agree with the conclusions of the Committee on Discipline as to each of the five delineated matters.

In the Nipko and CM&R matters the Discipline Committee found Depew in violation of I.C. § 3–104, § 3–420, and DR 1–102(4) and (5) of the Code of Professional Responsibility and the previous suspension order of this court. The evidence in the record supports this conclusion.

With respect to the Roundup matter, we agree with the Disciplinary Committee that the evidence in the record leaves some doubt as to whether Depew's actions constituted the unauthorized practice of law and that therefore, no disciplinary action is warranted.

In adopting the findings of fact and conclusions of law of the Discipline Committee, the Board of Commissioners amended the findings and conclusions with respect to the Jesser matter. In its recommendatory order, the Board concludes that Depew did learn of the discrepancy in the amount of the down payment prior to its disclosure at trial and that Depew thus had a duty to divulge this matter to the court. The Board of Commissioners concluded that in failing to do so Depew had violated DR 7–102(A)(4)(6) and (7) of the Code of Professional Responsibility. We disagree.

The contradictory conclusions reached by the Committee on Discipline and the Board of Commissioners apparently turns on their respective determinations of the point in time when Depew first became aware that only $1,000 of Jesser's alleged $11,000 down payment had been made in cash. The record supports the Board's conclusion insofar as it goes. Depew himself testified below that he was aware of this fact prior to the Pickett-Jesser trial. However, resolution of the question of whether or not Depew knew in advance that Jesser had paid only $1,000 in cash is not determinative of the alleged duty of Depew to reveal the fraud perpetrated by his client. Depew also testified that although he was in-

formed that Jesser had paid only $1,000 in cash, he was also told that Jesser had contributed the additional $10,000 by way of services rendered to the partnership. Depew testified that he believed that $10,000 was a reasonable value of the services Jesser had performed. He stated that since he felt $10,000 to be reasonable he had no reason to believe that Jesser had defrauded Pickett and felt no obligation to inform Pickett or the court that only $1,000 of the $11,000 was in cash.

There is no evidence in the record to contradict Depew's statement that he believed $10,000 to be a reasonable value of Jesser's services and that no fraud had been perpetrated upon Pickett. The prosecution has not met its burden of showing that Depew knew or even had reason to believe that Jesser had misrepresented to Pickett that the $11,000 was paid in cash. We accordingly agree with the Discipline Committee that there is no basis for disciplinary action with regards to this matter.

The facts and circumstances of the Sunmountain Condominium matter present the most grievous of the alleged violations. Depew himself, in his post-hearing memorandum, states that he "wishes to make it clear at the outset that his conduct concerning that transaction was clearly questionable and [done] in an unthinking manner." Depew also points out that he has made arrangements to repay Sawtooth Title for all sums paid on title insurance claims in connection with this matter. He urges this court to suspend rather than disbar him from the practice of law.

The findings of the Discipline Committee indicate the facts to be as follows: It was contemplated in Sunmountain Condominiums Phase No. 1 that three sets of buildings would initially be constructed. These would be designated as Buildings Nos. 1, 2 and 3, respectively. On August 29, 1972, Le'Car Development Corporation, which was developing the project, executed a warranty deed to James and Maggie Privette conveying Unit C, C–2 of *Building No. 2* and 13.3% interest in the common area. Building No. 2 did not, and as of the date of

the hearing, still does not, exist. The building which was actually constructed and into which the Privettes moved was in fact Building No. 1. On August 18, 1972, the Privettes executed a deed of trust on Building No. 2, Unit C, C–2 to Sawtooth Title Company as trustee and First Security Bank of Idaho, N.A., as beneficiary. This document was recorded on August 23, 1972. On November 24, 1972, Sawtooth Title, as agents for Lawyers Title Insurance Corporation, issued an ALTA Loan Policy of Title Insurance, insuring Building No. 2, Unit C, C–2, in the amount of $32,000 in favor of First Security. In December of 1972, Sawtooth discovered the error which had been made and realized they had issued an insurance policy on a vacant lot. On December 22, 1972, Sawtooth wrote to Privette notifying him of the error and requesting that he sign a corrected deed of trust which correctly referred to Building No. 1, Unit C, C–2. Sawtooth also informed Privette that it had prepared a new warranty deed on Building No. 1, Unit C, C–2, for Le'Car to sign. On January 30, 1973, Sawtooth sent a follow-up letter to Privette informing him that it had received the new warranty deed from Le'Car and again requesting him to sign the corrected deed of trust and the quitclaim deed. Two representatives of the title company testified below that it was about this time, in February or March of 1973, that Depew, who had been Privette's attorney since December 22, 1972, was contacted and asked to persuade Privette to sign these deeds. They further testified that Depew agreed on several occasions to "take care of it" or "get it done". Instead of urging Privette to sign the deeds, Depew advised him not to do so.

In November of 1972, Le'Car had forfeited its corporate license. On June 13, 1973, the officer/shareholders of Le'Car executed a power of attorney authorizing Depew to wind up the affairs of the corporation. Depew then designated himself as president of Le'Car and Privette as secretary. On September 25, 1973, Depew, acting as president of Le'Car and with full knowledge of the mistake in the property descriptions, signed a quitclaim deed transferring Building No. 1, Unit C, C–1, C–2 and B–1 to CM&R, Inc. Depew was at that time a 50% owner of CM&R. The Privettes, at Depew's direction, also executed a quitclaim deed to CM&R on this same property. Depew testified that this was done on the chance that the Privettes had acquired some sort of equitable interest in Building No. 1, even though their deed referred to Building No. 2. The Privettes were paid some "$4,000 or $5,000" for their interest. On January 2, 1974, Depew and Privette, as directors and trustees of Le'Car, executed a corrected warranty deed on Building No. 1, Unit C, C–2 to CM&R, Inc. Depew testified that this was done because he had learned that Le'Car had been a defunct corporation at the time he had signed the first deed from Le'Car to CM&R and he was concerned that his signature as president of a defunct corporation would be invalid. On March 21, 1974, Depew, as trustee for Le'Car, executed a second corrected quitclaim deed to CM&R on Building No. 1, Unit C, C–1, C–2 and B–1. This was also done to insure that the transfer from Le'Car to CM&R was effective.

At the time of the execution of these corrective deeds Depew was involved in a separate condominium venture. CM&R Properties, which was a limited partnership composed of CM&R, Inc. as the general partner and two other individuals as limited partners, purchased two other buildings known as Piedmont Condominiums and Frenchmen's Condominiums. Depew testified that certain other individuals, including the president and title officer of Sawtooth Title, had verbally promised to contribute money and take part in the limited partnership but had reneged. Depew stated that in reliance on these promises he had already signed personally to tie up the properties and as a result of these individuals backing out stood to lose what he had put in as well as being held liable on notes which were coming due.

On December 28, 1973, CM&R, Inc., executed a deed of trust on Building No. 1, Unit C, to Virgil Wilson to secure a loan from Wilson to CM&R, Inc., of $18,000.

The deed was signed by Privette as president and Depew as secretary of CM&R, Inc. Of this $18,000, "$10,000 or $11,000 but not over $12,000" went to pay off the loan which Depew had personally secured to finance the purchase of the Piedmont and Frenchmen Condominiums by CM&R Properties. Depew testified that it was either do this or "let the whole thing go". The subsequent recording of this deed of trust by Wilson deprived First Security of what should have been a senior security position on Building No. 1 and resulted in Sawtooth paying on the title insurance policy.

The record leaves little doubt but that Depew's actions were calculated to benefit himself at the expense of First Security and primarily Sawtooth. Depew testified that he knew at the time the deed of trust to Wilson was recorded that Wilson would obtain a prior security interest in Building No. 1. Depew also testified that some three weeks prior to executing this deed of trust to Wilson, he personally received a letter from an attorney for Sawtooth asking that CM&R, Inc. reconvey Building No. 1, Unit C, to Le'Car and that the Privettes execute the corrected deed of trust and quitclaim deed. Depew stated that he was "probably" motivated by a desire to retaliate against the two representatives of Sawtooth who had backed out on the limited partnership which he had proposed and organized, and that at the time he signed the deed of trust to Wilson he intended to take advantage of the mistake in the property description to the benefit of a corporation in which he held a one-half interest, CM&R, Inc. This court agrees with the Discipline Committee and the Board of Commissioners that such conduct constitutes a flagrant violation of DR 1-102(4) and (6) of the Code of Professional Responsibility.

Depew asks only that his punishment be suspension rather than disbarment. We feel, however, given the gravity of these circumstances, that imposition of this lesser sanction would not suffice. The purpose of suspension and disbarment proceedings is to exact justice, to purge the profession of unworthy and unscrupulous lawyers, and to protect the public from those who are found unfit to perform the duties of an attorney. *In re Felton*, 60 Idaho 540, 94 P.2d 166 (1939); *In re Carter*, 59 Idaho 547, 86 P.2d 162 (1938). The interests of the citizens of this state and of the legal profession dictate that Jay L. Depew be disbarred from the practice of law.

The findings of the Committee on Discipline that Depew has engaged in violations of ethical standards and of the previous suspension order of this court is adopted and affirmed. The findings of the Board of Commissioners are modified to conform with those of the Committee. The recommendation of the Board that Depew be disbarred is accepted and affirmed.

Jay L. Depew is hereby disbarred (as defined by Rule 153(a) of the Rules of Disciplinary Enforcement and Withdrawal of Right to Practice Law of the Idaho Supreme Court and the Board of Commissioners of the Idaho State Bar). The Board of Commissioners is directed that it shall not consider any application for reinstatement for a period of five years pursuant to Rule 169 of the Rules of Disciplinary Enforcement. It is further ordered that Depew may not apply for reinstatement under Rule 169(b) until such time as he has fully made restitution to Sawtooth Title Company in accordance with their present agreement, has paid the costs of these proceedings against him, and has again taken and passed the Idaho State Bar Examination.

DONALDSON, SHEPARD, BAKES and BISTLINE, JJ., concur.