(No. 6688.   September 16, 1939.)

In re JAMES H. FELTON.

[94 Pac. (2d) 166.]

Whitla & Knudson, for Petitioner.

C. H. Potts, John W. Cramer and Leo McCarty, for the Commission.

Communications between attorney and client are not privileged unless they are for a lawful purpose or in furtherance of a lawful end. (Canons of Professional Ethics of the American Bar Association: 28 R. C. L., "Witnesses," sec. 158; *In re Watson*, 83 Neb. 211, 119 N. W. 451–453; *Ex parte McDonough*, 170 Cal. 230, 149 Pac. 566, Ann. Cas. 1916E, 327, L. R. A. 1916C, 593; *Hartness v. Brown*, 21 Wash. 655, 59 Pac. 491.)

The acts and declarations of a conspirator are admissible against his coconspirator. (*State v. Corcoran*, 7 Ida. 220, 61 Pac. 1034; *State v. Hammock*, 18 Ida. 424, 110 Pac. 169.)

BUDGE, J.—Disciplinary charges were filed against James H. Felton, a member of this bar, and the bar commission after prosecution before it by a prosecuting committee found petitioner guilty of certain violations of his duties as an attorney and recommended disbarment of the petitioner, who filed a petition for review pertaining to paragraphs one, two, four and seven of the findings of the commission and their recommendations.

The complaint with reference to the first matter here for consideration alleges:

"That in July, 1935, there was a suit pending in the District Court of the Second Judicial District . . . . wherein the First Trust & Savings Bank of Moscow was suing one A. E. Randall on a guarantee on two promissory notes, wherein it appeared from the face of the complaint that the Statute of Limitations had run on said notes and wherein it was alleged that the defendant, A. E. Randall, was a non-resident of the State of Idaho and that the Statute of Limitations had been tolled; that in July, 1935, while said suit was pending, said defendant, A. E. Randall, retained Abe Goff, a practicing attorney in Moscow, . . . . to defend said suit and informed said Goff that he had been in Montana

practically all of the time since the notes were executed; that shortly prior to the time the case was first set for trial, in February, 1936, said Randall asked Mr. Goff if he would be willing to have James H. Felton associated with him in the case; that said Felton was thereafter associated in the case; that said Felton advised said Randall that the plaintiff First Trust & Savings Bank of Moscow, could not prove that he was out of the State and suggested to and advised said Randall that if his testimony was to the effect that he had been a resident of Idaho during all of the time since the execution of the notes the action would be barred by the Statute of Limitations; that the said James H. Felton advised A. E. Randall that if he was going to testify that he had been in Idaho selling oil stock around Lewiston, Idaho, that he had better get down to Lewiston and stay around there a day or two and learn something about the country; that thereafter said A. E. Randall, pursuant to the advice given by said James H. Felton, spent considerable time in and around Lewiston, Idaho.

"That said case came on for trial in April, 1936, and at said hearing said A. E. Randall testified that he had been in and around Lewiston, Idaho, during all the time since the execution of said notes principally engaged in the business of selling oil stock; that said testimony was false; that on the strength of said testimony judgment was entered for said A. E. Randall. Thereafter a motion for a new trial was granted and at the new trial it was proved that said defendant, Randall, had resided at all times within the State of Montana and judgment was entered for the plaintiff; that said James H. Felton had advised and induced said defendant, A. E. Randall, to testify falsely in said proceedings, knowing the same to be false."

Defendant's answer to the foregoing was as follows:

"Denies each and every allegation, matter and thing set forth in said paragraph III, except that in July, 1935, there was a suit pending . . . . on a guaranty on two promissory notes and that it was alleged in the complaint in said action that A. E. Randall was a non-resident of the State of Idaho, and that the statute of limitations had been tolled, and it

appeared from the face of the complaint that the statutes of limitations had run on the notes sued upon.

"Further answering said paragraph, defendant alleges that the firm of Orland & Goff, attorneys residing at Moscow, Idaho, were the original attorneys for the defendant, A. E. Randall, in said action and that prior to the time that this answering defendant was associated in said case a verified answer to the complaint had been filed denying the allegation of nonresidence and that the statute of limitations had been tolled, which answer was verified by the defendant, A. E. Randall, and signed by his attorneys, Orland & Goff. That this answering defendant was not associated in said action until the morning of the day upon which the case was set for trial and became associated upon motion made by Mr. Goff of the firm of Orland & Goff. That this answering defendant, at the solicitation of A. E. Randall, became associated in the case primarily and principally for the purpose of presenting to the Court a question of law and did not conduct the examination of any witnesses during the trial and the only active part which this answering defendant took during said trial was to present to the court a motion for non-suit on behalf of the said A. E. Randall, which was granted by the Court. Thereafter, upon application by the plaintiff the case was re-opened and additional testimony introduced and judgment was rendered in favor of the plaintiff in the case. That said case is now pending upon appeal to the Supreme Court of the State of Idaho."

Petitioner urges that the board "erred in permitting the witness Abe Goff to testify, over petitioner's objection, to conversations purely and strictly hearsay, to the prejudice of petitioner." Upon the hearing Mr. Goff was permitted to testify, among other things, that he had a conversation with Mr. Randall in the absence of Mr. Felton with relation to the defense of the statute of limitations raised by the pleadings in *First Trust & Savings Bank v. Randall.* In this purported conversation Mr. Goff testified in effect that Mr. Randall stated to him that Mr. Felton had advised him that if he, Randall, was going to rely upon the statute of limitations having run by his presence in Idaho, that he, Randall, should

go to Lewiston and learn something about the town, and that then Mr. Randall stated he had to go down and learn something about Lewiston, that he wanted to go out to the mill and see where it was, ride up and down some of the roads, see the names of some of the streets, learn the names of the hotels, and kind of get the lie of the land around Lewiston. That he was going down and stay two or three days and familiarize himself with Lewiston and the surrounding country. The admission of this testimony was objected to upon the ground that it was hearsay and therefore not admissible. It is contended, however, that this testimony of Mr. Goff was admissible under the rule governing the admissibility of evidence as to the acts and declarations of a conspirator against his coconspirator, and the rule is referred to that where it appears two or more persons have conspired to commit an offense, everything said, done, or written by one of them during the existence of the conspiracy and in the execution or furtherance of the common purpose is admissible in evidence against the others. Unless this evidence is admissible upon the theory above indicated it would seem that it is conceded it is purely hearsay and not admissible. It is stated in respondent's brief that:

"If the inference is warranted from the evidence that the petitioner and Mr. Randall had decided to offer false testimony as to the presence of Mr. Randall in Idaho for a period of more than five years to support the defense of the Statute of Limitations, then it must follow that such an arrangement or agreement constituted a conspiracy to do an unlawful act."

We do not think this contention can be upheld. The conversation between Mr. Goff and Mr. Randall was as to Mr. Felton purely hearsay and prejudicial in the extreme. It would be dangerous indeed to undertake to support its admission upon the ground and for the reason that it was an inference warranted from the evidence that Mr. Felton and Mr. Randall had decided to offer false testimony as to Mr. Randall's presence in the state for a period of more than five years.

The rule stated in *State v. Corcoran,* 7 Ida. 220, 61 Pac. 1034, to which the commission refers is:

"The declaration of one conspirator, *the conspiracy being established,* while he is acting in furtherance of the common design, is competent evidence against his co-conspirators." (Emphasis inserted.)

Without Mr. Goff's testimony the evidence will not justify the conclusion that a conspiracy was proven or established. It is the establishment of a conspiracy upon which the rule in *State v. Corcoran, supra,* is founded. The general rule is that a combination or conspiracy must be established before the acts, declarations, or confessions of one alleged conspirator can be given in evidence against another.

"The first assignment is based upon the admission of a great mass of evidence as to occurrences taking place between one Wilson, a prisoner, and Wilson, his attorney, not in the presence of the defendant, and subsequent to the release of the prisoner from jail, upon an order based upon the aforesaid false and forged bond. There appears to be no evidence in the record of any conspiracy existing between the defendant and the two Wilsons bearing upon the subject-matter of the crime here alleged; and for that reason all matters occurring without the presence of the defendant between the Wilsons were inadmissible in evidence as in any way affecting his rights." (*People v. Kelly,* 133 Cal. 1, 64 Pac. 1091.)

(*State v. Quen,* 48 Or. 347, 86 Pac. 791; *State v. Teubner,* 58 Mont. 482, 193 Pac. 534; *State v. Booth,* 82 Or. 394, 161 Pac. 700; *People v. Conte,* 17 Cal. App. 771, 122 Pac. 450, 457; *Mayola v. United States,* 71 Fed. (2d) 65; *Minner v. United States,* 57 Fed. (2d) 506; *Nibbelink v. United States,* 66 Fed. (2d) 178; *State v. Binder,* 190 Minn. 305, 251 N. W. 665; *State v. Stogsdill,* 324 Mo. 105, 23 S. W. (2d) 22; *Solomon v. State,* 168 Tenn. 180, 76 S. W. (2d) 331; *Crawford v. Commonwealth,* 242 Ky. 80, 45 S. W. (2d) 824; *People v. Tempomgko,* 134 Cal. App. 209, 25 Pac. (2d) 245.) Mr. Felton was not present and knew nothing about the alleged conversation between Mr. Goff and Mr. Randall. No conspiracy was attempted to be shown by any evidence other

than the testimony of Mr. Goff. The record also discloses that Mr. Goff was permitted to testify as to conversations between himself and Mr. Felton relating to Mr. Randall's case. The rule is stated in 70 C. J. 403, sec. 543, that:

"Where two or more attorneys represent the same party, communications and consultations between them with respect to the rights, liabilities, etc., of such party are privileged."

Thornton on Attorneys at Law, volume 1, page 177, section 102, says:

"Communications between counsel for the same party touching the subject-matter of the litigation are privileged." (*Jones v. Nantahala Marble & Talc Co.*, 137 N. C. 237, 49 S. E. 94; *Missouri, K. & T. Ry. Co. v. Williams*, 43 Tex. Civ. App. 549, 96 S. W. 1087.) No conversations between Mr. Goff and Mr. Felton, attorneys for Mr. Randall, touching the subject-matter of the litigation were admissible against Felton. No conspiracy was proven, nor evidence offered for such purpose, except the alleged conversation between Mr. Goff and Mr. Randall. No predicate had been laid showing the conspiracy, independent of the alleged declarations made by Mr. Randall to Mr. Goff, and such declarations, in the absence of Mr. Felton, were thus not admissible against him. As tersely stated in petitioner's brief:

"Suppose Mr. Randall had gone to Mr. Felton and told him in substance that the notes had been delivered but that Mr. Goff had advised him to deny that they were ever delivered—would such a conversation had in the absence of Mr. Goff be admissible against him and be considered sufficient to justify a conviction of subornation of perjury?"

With this evidence of the alleged conversation between Mr. Goff and Mr. Randall and between Mr. Goff and Mr. Felton stricken from the record there is no substantial evidence to support the allegation contained in the first charge "that said James H. Felton had advised and induced said defendant, A. E. Randall, to testify falsely in said proceedings, knowing the same to be false."

It should be noted that long before Mr. Felton was consulted or became an attorney in the case of *First Trust & Savings Bank v. Randall*, the question of whether or not Mr.

Randall had been in the state for a period of more than five years was squarely put in issue by the complaint, answer, and amended answer. The complaint alleged:

"That at all times since the 19 day of March, 1931, the defendant herein has been absent from the State of Idaho and a nonresident of the state, saving and excepting that on a few scattered occasions he has returned temporarily to Idaho, but that the length of his stays within the State since March 19, 1921, to the present time have not aggregated in all five years and have not exceeded in total aggregate duration a period of ninety days."

By both the answer and the amended answer, each bearing the name of Mr. Goff as an attorney for the defendant Randall, Mr. Randall denied the foregoing allegations and alleged that both causes of action were barred by the provisions of sections 5–216 and 5–239, I. C. A. There was a conflict in the testimony adduced and the court found:

"That at all times since the 19th day of March, 1921, the defendant herein has been absent from the state of Idaho and a non-resident of the State, saving and excepting of a few scattered occasions he has returned temporarily to Idaho but that the length of his stays within the State, since March 19, 1921, to the present time have not aggregated in all five years and have not exceeded in total aggregate duration a period of ninety days."

The court did not find that Mr. Randall committed perjury or had testified falsely. Certainly, a finding contrary to a party's allegations and proof cannot be said to be a finding that perjury was committed. The conversation between Mr. Randall and Mr. Goff not being admissible since the same was hearsay, there is no competent legal evidence of a conspiracy between Mr. Randall and Mr. Felton or that Mr. Felton advised and induced Mr. Randall to testify falsely.

The second charge to be considered recites as follows:

"That the said James H. Felton did, during the month of August, 1934, solicit a personal injury action under the following circumstances, to-wit:

"That on or about the 18th day of August, 1934, near Moscow, Idaho, one Charley Ayer and one Lloyd Lyons were

involved in a motor vehicle accident and collision; that one Tena Veum was at the time a passenger in the Ayer car; that she received some injury in said accident; that at the time of said accident and all times thereafter she had no thought of bringing suit or action against any of the parties involved in said accident or collision; that shortly after the date of said accident and collision, and while at her home in Moscow, Idaho, she received a telephone call from James H. Felton asking her if she intended to sue said Ayer for damages arising from said accident; that she informed said Felton that she had no such intention and he informed her that said Ayer had been at fault; that she had a good cause of action against him and that she could recover plenty of money for both herself and said Felton in the event she brought action against said Ayer; that a few days thereafter said Felton again called her by phone and that time requested her to come to his office and go over the facts of the accident with him; that she refused to do so.

"That said conduct on the part of said James H. Felton is unethical, unprofessional and in violation of the Canons of Ethics of the Idaho State Bar and of the Rules of Conduct of the Idaho Supreme Court by attempting to stir up litigation."

Petitioner's answer to this charge recites:

"Denies each and every allegation, matter and thing set forth in Paragraph II of said second cause of complaint, except that on or about the 18th day of August, 1934, near Moscow, Idaho, one Charley Ayer and one Lloyd Lyons were involved in a motor vehicle accident, and that one Tena Veum was, at the time, a passenger in the Ayer car.

"Further answer(ing) said paragraph, this defendant alleges that at the time this defendant talked to the said Tena Veum by telephone, he had been retained by Lloyd Lyons to represent him in his claim for damages as a result of the accident and the only conversation which this answering defendant ever had with the said Tena Veum, by telephone or otherwise, was had for the purpose and with a view of learning what the said witness' version was covering the cause of the accident and how it happened. That the only

times which this answering defendant ever talked with the said Tena Veum, by telephone or otherwise, his client Lloyd Lyons was in the office of the defendant and it was in his behalf that the telephone conversation was had.''

The record discloses without contradiction that such an accident did occur; that Tena Veum (Cole), riding with Ayer, received some slight injury; that her hospital expenses were paid by Ayer; that she brought no action against Ayer; and that in the suit brought by Mr. Felton for Mr. Lyons against Mr. Ayer she appeared as a witness in Mr. Ayer's behalf. It is conceded that Mr. Felton did call upon Tena Veum (Cole) with reference to her appearing as a witness in Lyons' behalf. The matter in connection with Mr. Felton's soliciting Tena Veum (Cole) to bring suit, however, is contradicted. The testimony of Tena Veum (Cole) with reference to Mr. Felton's calls is as follows:

''Q. What did Mr. Felton say to you when he called you by telephone at that time?

''A. He wanted to know if I was going to start suit and I told him no.

''Q. Suit against whom?

''A. Mr. Ayers. . . . .

''Q. Did he tell you who he was?

''A. Yes.

''Q. What did he tell you?

''A. He told me he was Mr. Felton.

''Q. Did he tell you he was an attorney at law?

''A. Yes, Uh huh.

''Q. And after you told him you were not going to start suit against Mr. Ayer, what did he say to you?

''A. He said he thought it was my duty to. He said if I didn't Mr. Lyons would. . . . .

''Q. What else, if anything, did he say with reference to what you could accomplish by starting suit for yourself and him?

''A. He said I would get plenty money out of it. . . . .

''Q. Did you receive any telephone calls from Mr. Felton subsequent to that time?

"A. Well, not until after Mr. Lyons started suit. Then I did . . . . A. He came over to where I was working, over to the sorority house, him and Mr. Lyons.

"Q. And at that time what was said?

"A. He wanted me to be a witness for Mr. Lyons. . . . .

"A. I told him I wasn't going to be a witness for Mr. Lyons.

"Q. Did you tell him anything else?

"A. Yes, I told him it wasn't Mr. Ayers' fault, I didn't think. . . . .

"Q. And did you ever become a witness for Mr. Lyons?

"A. No, I was a witness for Mr. Ayer. . . . .

"Q. When Mr. Felton called you the first time on the telephone he told you, did he not, that he was being consulted by Mr. Lyons in connection with that accident?

"A. Yes.

"Q. And he inquired of you regarding your version of how the accident happened, didn't he, on the telephone?

"A. No. He asked me to call at his office and talk it over with him."

■ We think the question: "What else, if anything, did he say with reference to what you could accomplish by starting suit for yourself *and him?*" was leading, prejudicial and improper. While it appears that the question was suggestive and leading the witness answered: "He said *I* would get plenty money out of it." It is alleged in the complaint that Felton informed Tena Veum (Cole) "that she could recover plenty of money for both herself and said Felton in the event she brought action against said Ayer"; but the witness limited her answer to the effect that Mr. Felton said *she* would get plenty of money out of it if she brought suit.

■ In *In re Baum,* 32 Ida. 676, 186 Pac. 927, this court said:

"It may be stated to be a well-settled rule in disbarment proceedings that charges of official misconduct must be established by a clear and undoubted preponderance of evidence."

"The court should never disbar a lawyer on testimony of a doubtful character. But the charges should be clearly sus-

tained by convincing proof and a fair preponderance of the evidence.''

(Thornton on Attorneys at Law, vol. 2, p. 1307, sec. 886; *People v. Robinson,* 32 Colo. 241, 75 Pac. 922; *In re Houghton,* 67 Cal. 511, 8 Pac. 52.)

■ Applying the foregoing facts to the facts heretofore set out we are not constrained to hold that Mr. Felton solicited business from Tena Veum (Cole) or sought to induce her to employ him as her attorney to bring an action against Ayer for damages. The testimony supporting such a contention is not clear and undoubted and neither is there a preponderance of evidence to establish it.

The charge with reference to the third matter to be considered alleges as follows:

''That on or about the 7th day of August, 1938, while said James H. Felton was appearing as attorney for plaintiff in a cause entitled '*Randall v. Sturdevant,*' said Felton took an exhibit properly introduced in said action into his hands and secreted the same in his personal files, with intent to deprive the court of the benefit of said evidence, and thereafter at the close of said trial it was found said exhibit was missing from the court files and said Felton assisted in a search for the same and upon the defendant's announcement that said Felton had said exhibit it was discovered in his files.''

Defendant denied the foregoing allegations and further alleged:

''That the exhibit referred to was accidentally and unintentionally co-mingled with the papers and files of this defendant without the knowledge or any intention to secrete the same on the part of the defendant.''

■ The record discloses that with relation to the case of *Randall v. Sturtevant,* before J. C. Peterson, Justice of the Peace, Mr. Felton appearing for Mr. Randall and Murray Estes appearing at the trial for Sturdevant in the absence of Sturdevant's attorney, A. L. Morgan, an exhibit, a notice to vacate, marked ''Exhibit A,'' the party who introduced the same not being designated, became lost or mislaid and was, after search, found in a file of papers belonging to Mr.

Felton. The record is not clear as to who introduced the exhibit, Mr. Felton testifying in effect that he demanded it be produced at the trial and placed the same in evidence. To the contrary there is evidence that the exhibit was introduced by the defendant Sturdevant. The commission's theory was that Mr. Felton believing the exhibit to be adverse to the interests of his client purposely secreted the same and this theory is supported in the main by the testimony of Mr. Sturdevant, the defendant in such suit and against whom judgment was entered. Sturdevant's testimony was to the effect that while sitting some twelve feet away from the table being used by the two attorneys and the judge he observed the judge lay the exhibit on a bunch of his papers and saw Mr. Felton pick up the exhibit and stick it under his file and that after the search had been in progress some little time that he, Sturdevant, told them what he had observed and that Mattie Randall, the witness on the bench raised up, reached over and drew the file to her, looked through the file, and found the exhibit. On the other hand, other witnesses who testified for the commission did not state that Mr. Felton had secreted the exhibit but merely that it had been found in his file after the case was closed. It appears the trial of the case was held in a fire station and that attorneys and the judge all sat around and spread their books and papers upon a table three feet in width and from six to eight feet in length and at the close of the trial and when gathering up the files it was found this exhibit was missing. In the instant proceedings the parties stipulated that depositions might be taken before notarys public upon notice of the time and place of taking and the name of the notary public, given at least ten days before taking the deposition. In accordance with such stipulation notice was given of the taking of the deposition of Justice of the Peace Peterson and such deposition was taken, attorneys for the commission did not appear however. It is recited in a note to the findings of fact of the commission as follows:

"If it be urged that Mr. Felton produced evidence in opposition to the witnesses of the prosecuting committee, it

may be stated that the Commission regarded such evidence of little or no probative value, having violated the rule:

" 'The probative value of evidence of a witness is lessened where obtained by leading questions which were so propounded that the witness practically merely assented or dissented.' 23 C. J. 4, sec. 1785. *Huffman v. Buckingham Transportation Company,* 98 Fed. (2d) 916.

"It will be noted that upon reading the evidence of Mr. Felton's witnesses, which were for the greater part taken without anyone being present to cross-examine, that he merely testified for them and asked their approval or disapproval of the evidence in such a way as to make it entirely favorable to him.

"It may also be noted that with reference to the recommendation the Commission considered the previous record of Mr. Felton, as shown by the records of the Supreme Court."

An examination of the deposition taken, of which the bar commission had notice, on its face appears to definitely refute a charge that Mr. Felton testified for the Judge and merely asked his approval or disapproval of the evidence in such a way as to make it entirely favorable to him. The deposition reads in material part:

"Q. Do you remember a case as coming up in your court on the 7th day of August, 1937, and entitled 'Arthur W. Randall, versus J. L. Sturdevant?'

"A. Yes sir.

"Q. Who were the attorneys on that case?

"A. J. H. Felton, counsel for the plaintiff, and Murray Estes Counsel for the defense.

"Q. Mr. Peterson, just tell in your own words in detail what happened in the course of the trial.

"A. The case came on in regular manner and was duly tried and a decision was rendered by the Court and the Court dismissed. We then proceeded to gather up the papers in the case, my own and the attorneys were gathering up their papers, and it was discovered while that was being done, that one of the documents was missing. The document was a Notice to Vacate, given by the plaintiff to the defense. It was a very small paper and it was missed, and we commenced

to hunt for it, all of us. The table must have been three feet wide and eight or nine feet long, and my position was about the center of the table, and Mr. Felton was sitting at the left side of the table, back of it with his papers next to him. Mr. Murray was on the right side of the table and his papers were next to him. My own papers were next to me. When we missed that paper, we all started to hunt for it, and we were rattling papers around there and picking out files searching. Finally the paper was discovered in Mr. Felton's files. We were all anxious to have the paper found, Mr. Felton as well as any of us, and the papers were all out on the table and he riffled them up and searched their own and my papers. I do not remember who found the paper.

"Q. Now, Mr. Peterson, had this paper been used by Mr. Felton in examining a witness?

"A. Yes it was used in examining a witness.

"Q. Mr. Peterson, were Mr. Felton's files placed in his brief case?

"A. They were lying on the table.

"Q. Had he picked them up yet?

"A. He had not picked them up yet . . . .

"Q. What action had been taken by the Court during the proceedings and prior to the time of the missing of the exhibit in reference to such exhibit?

"A. A certified copy had been given to the defense attorney.

"Q. At what stage in the proceedings?

"A. I do not remember about that. It was some time during the trial. It was before we missed the other document, anyway.

"Q. When you made the certified copy, did you examine the original to determine whether the copy was a true and correct copy?

"A. I did.

"Q. What, if any, reason would you have to believe that any person had knowingly, to believe that any person had taken the exhibit?

"A. I had no reason to believe anything like that.

"Q. Was there any charge made that the exhibit had been knowingly secreted?

"A. None at all. I will say this, Mr. Felton, if I had had any idea or suspicion that anybody had knowingly tried to dispose of that exhibit, I would have taken action immediately. But it never entered my head that it was anything but an accident, that it got mixed up with those papers."

An examination of the deposition discloses that comparatively few of the questions were leading and there were no leading questions as to material matters before the commission. In considering the charge that Mr. Felton secreted the exhibit, properly introduced in evidence, with intent to deprive the court of the benefit of said exhibit, it is evident from the record that the commission disregarded and ignored completely the testimony of Peterson the justice of the peace, a disinterest witness, and as a reason for so doing the commission states that the questions asked were leading and the answers entitled to little or no weight. Under the circumstances and facts above recited we are not of the opinion that the commissions action in this regard can be upheld. If the commission had given proper weight and consideration to the testimony offered on behalf of Mr. Felton we are not of the opinion that the commission's finding would be guilty of the charge as laid. It would seem just as consistent to hold that the exhibit was accidentally and unintentionally commingled with the files of the petitioner without his knowledge or any intention on his part to secrete the same as to hold that he secreted the exhibit in his file with intent to deprive the court of the benefit of the exhibit. Under the rule announced in *In re Baum, supra,* heretofore quoted, it would appear that this charge was not proven by a clear and undoubted preponderance of evidence. It might be here noted that the justice of the peace who heard the case, wholly disinterested in its outcome, positively and unequivocally testified in his deposition that the loss of this *small piece of paper* was accidental and that there was nothing happened during the progress of the trial that in any way caused him to believe that the same had been intentionally taken and secreted by petitioner. On the other hand, Mr. Sturdevant, the losing party, testified that he saw Mr. Felton place the exhibit in his files and that he so advised during the search. Strange

as it may seem, we cannot find in the record where his testimony in this regard is corroborated. Mr. Estes himself testified that he did not hear Mr. Sturdevant say that he had seen Mr. Felton put the exhibit in his file. We are not inclined to the view that evidence of this character would warrant the conclusion that petitioner should be disbarred.

The fourth matter with which this review is concerned alleged:

"That on the 23rd day of November, 1936, the said James H. Felton, without any right or authority, commenced an action in the probate court of Latah County, Idaho, in the name of Maurice Hanson against Murray Estes, seeking to recover the sum of $61.25; that while said action was pending the said Maurice Hanson, plaintiff, stated that at no time did he ever authorize said James H. Felton to bring said action against Murray Estes and signed a stipulation to dismiss the said action and the same was thereafter dismissed."

Such allegations were denied. With reference to this charge the record discloses that Maurice Hanson, 72 years of age, who apparently neither reads or writes nor well understands English, worked for his son Henry Hanson in a sawmill. The son was unable to meet payroll obligations and employees filed attachment suits and labor liens against lumber which was left. The old gentleman instructed another son, Walter Hanson, in substance to turn his claim for wages over to an attorney "to the law." The son turned the claim over to Mr. Felton who brought suit against Murray Estes, who represented that he was trustee of the Henry Hanson assets. In an affidavit secured by Mr. Estes from Maurice Hanson, without Mr. Felton's knowledge, the old gentleman states in substance that he did not authorize Mr. Felton to bring suit to prosecute an appeal. He does not, however, state that he did not instruct his son Walter Hanson to have some attorney collect his claim or bring suit and take an appeal. There is evidence that the relationship between Mr. Estes and Mr. Felton was considerably strained. It also appears that Mr. Estes obtained from Maurice Hanson a stipulation to dismiss the case as well as the affidavit above referred to. The case was dismissed without Mr. Moore, the attorney

for Mr. Felton, or Mr. Felton being advised of such dismissal and it was some considerable time thereafter before Mr. Moore or Mr. Felton learned that the stipulation had been signed, the affidavit given and the suit dismissed. While it may be true that it would have been advisable for Mr. Felton to contact Maurice Hanson and ascertain whether the son was authorized to act for him, and it appears there is evidence, from Maurice Hanson himself, that Mr. Felton had talked to him about the matter, there is considerable evidence that members of the Maurice Hanson's family, due to his lack of knowledge of the English language did arrange such matters for him. A perusal of Maurice Hanson's testimony leaves the conviction that his only interest, desire or purpose was to get his money. From his testimony it appears that when he signed the papers presented to him by Mr. Estes he believed and stated that he signed only one. Whether it was the stipulation or the affidavit is not disclosed and the record justifies the conclusion that Maurice Hanson was not sure himself what he had signed, other than it was some paper which permitted him to get his money. It is apparent that at no time did he understand what was in either paper, only that by signing he would get his money. It does not appear that Mr. Felton's conduct in this respect can be said to warrant the finding of the commission that:

"In bringing said suit on behalf of one Hanson against said Estes was corrupt, illegal, and unlawful, and was without authority, and that said conduct on the part of said Felton, as disclosed by the evidence was such as to warrant a disciplinary order. (Disbarment.)"

Considering all the facts in connection with this transaction and all the circumstances we are not disposed to hold that it was such conduct on the part of Mr. Felton as would justify his disbarment.

To be called upon to review recommendations made by the bar commission in a disbarment proceeding is no easy duty to perform. The services of the commission are gratuitous and often unpleasant. The purpose of the commission is at all times to do exact justice and to purge the profession of unworthy and unscrupulous lawyers. In the ad-

ministration of its duties, however, the commission is not authorized to permit the admission of incompetent evidence. An examination of the record in the instant proceedings as well as an examination of the cases out of which many of the matters charged arise, including *Randall v. Sturdevant,* referred to herein, *First Trust & Savings Bank v. Randall,* 59 Ida. 705, 89 Pac. (2d) 741, In The Matter of The Estate of Mary Elizabeth Randall, Deceased, *ante,* p. 419, 93 Pac. (2d) 1, discloses that unusual bitterness exists among the attorneys appearing in such cases. When such a situation arises the main purpose to be accomplished is often lost sight of.

There is nothing more unfortunate that can happen to an attorney than the circulation of unfounded rumors of the instigation of proceedings looking to disbarment, suspension or reprimand. It behooves the court and the bar commissioners to exercise the greatest care and diligence in order that no injustice be done in the performance of their respective duties. We are not persuaded that the charges have been sustained by the proof, but are confident from a reading of the record that the charges have not been sustained and that there is an absence of or not sufficient evidence to warrant the making of the recommendation that petitioner be disbarred.

We must deny the recommendation and direct that the proceedings be dismissed.

Ailshie, C. J., and Givens and Holden, JJ., concur.

Morgan, J., deeming himself disqualified did not participate in the opinion.